UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA
Case No. 23-02686-heb
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of:

MICHAEL GAVIN MORGAN,

Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court
1100 Laurel Street
Columbia, SC 29201

March 19, 2024
11:32 AM

B E F O R E :
HON. HELEN E. BURRIS
U.S. BANKRUPTCY JUDGE

ECRO: UNKNOWN

HEARING re Continued Motion to Dismiss Case Filed by George Benjamin Milam on behalf of Wells Fargo Bank, N.A. (01/11/2024) (Doc. 22)

HEARING re Continued § 362 motion of Wells Fargo Bank, N.A. filed January 11, 2024 (Objections due 1/25/2024) (01/11/2024) (Doc. 23)

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

PENN LAW FIRM, LLC

Attorneys for Michael Gavin Morgan

1517 Laurel Street

Columbia, SC 29211

BY: WILLIAM H. PENN

GLENN GLOVER

BRADLEY ARANT BOULT CUMMINGS

Attorney for Wells Fargo Bank, N.A.

214 N. Tryon Street, Suite 3700

Charlotte, NC 28202

BY: GEORGE B. MILAM

P R O C E E D I N G S

THE COURT: If the parties would state your appearances, please.

MR. MILAM: Ben Milam on behalf of Wells Fargo Bank. I have with me Glenn Glover on behalf of Wells Fargo.

MR. GLOVER: Good morning, Your Honor.

MR. PENN: Good morning, Your Honor. This is Harrison Penn on behalf of the Debtor, Michael Gavin Morgan. With me today is Mr. Morgan.

THE COURT: Okay. I haven't signed the pro hac order yet because we just got the fee in, like since last time I looked.

MR. MILAM: Yes, Your Honor. We delivered the fee this morning.

THE COURT: Okay. Still not admitted. So do you want to ask me if you can appear?

MR. MILAM: Yes, Your Honor. So Mr. Glover is a member of the Alabama Bar. He is a bankruptcy practitioner of more than 20 years. And we -- again, apologies for the delay in getting the fee to the Court. We respectfully ask for the Court to admit him pro hac vice.

THE COURT: Okay. I haven't had an opportunity to review the motion yet. It hasn't come my way because the fee wasn't yet paid. And that's our procedure. It comes after that. But for the purposes of today's hearing and

with you acting as local counsel, then I will allow that.

MR. MILAM: Thank you, Your Honor.

MR. GLOVER: Thank you, Your Honor.

THE COURT: Okay. So they're your motions and I have a bunch of exhibits here. Are you ready to proceed with opening statements or do you have any stipulations for me? Tell me where we're going.

MR. GLOVER: Your Honor, with respect to the stipulations -- Glenn Glover again for Wells Fargo Bank. And thank you for admitting me to practice before the court. And again, apologies for the snafu. Something happened and our assistants tried to file or did file that motion with respect to the payment of the fee.

I think there is one factual matter that we are in agreement on, and that's the valuation of the property. Or maybe we're not.

MR. PENN: I think we would agree that the 1.48 would be (indiscernible). I don't know that it's -- I think that (indiscernible).

MR. GLOVER: Okay, we do not have that stipulation, Your Honor.

The plan on that point, the plan bases the treatment of Claim Two, which is Dr. Fitch. And I don't remember if it's Mr. Morgan's ex-wife or ex-girlfriend. But it clearly bases the treatment of Dr. Fitch's claim on a

$1.48 million valuation. Because it proposed it to pay Wells Fargo $1.3 million and Dr. Fitch $180,000. So the plan as proposed -- and sorry to repeat it -- is based on that valuation. But if that's not a stipulated fact, I understand.

THE COURT: Okay. So I have the exhibit books. Are any of the exhibits stipulated or are we doing them one-by-one?

MR. PENN: Your Honor, I think we were just approaching them as they came in. Or do you want to stipulate --

THE COURT: I mean, is that because it's not possible to stipulate, or are you just not going to do it?

MR. GLOVER: Well, here is what I thought we had as an agreement, Your Honor. We have three affidavits in the record, the original one by Wells Fargo, which was attached as an exhibit to both of our motions or motion for relief from stay and our motion to dismiss. Those are Docket Numbers 22 and 23.

We have a supplemental affidavit of Wells Fargo, which is Exhibit A to our reply, which is Exhibit -- sorry, Docket Number 36. And we have an affidavit of Stacie Knight -- she is a partner at Winston Strawn -- and she was the attorney who represented Wells Fargo in the state court action, the state court litigation. That is Exhibit A to

Docket Number 36. Again, our reply.

It was my understanding that Mr. Penn has agreed that those affidavits and the statements therein can come in for the truth of the matter asserted. That doesn't mean of course he is waiving his right to contest those facts that are stated in the affidavit, but that he has agreed that statements in those affidavits can come in. And therefore the reason I did this, I just wanted to make sure I didn't need to have my witnesses available here for live testimony this morning.

MR. PENN: And we do consent to that. We'll stipulate.

MR. GLOVER: Okay. All right. And then I think just a follow-up point to that is that all of the exhibits that are attached to those three affidavits are properly authenticated and they can come into the record without an authentication challenge. The 30 exhibits that we have in our exhibit list, which we filed last night I think and which are in that notebook, Your Honor, this morning, all 30 of those exhibits except for two are exhibits to one of those three affidavits. The only two exhibits in our 30-exhibit exhibit list that are not exhibits to one of those three affidavits are Exhibit 24 and Exhibit 25.

And I have to refresh my recollection, Your Honor. I apologize.

24 is a CFPB complaint that Mr. Morgan made. And I think the date was July 12th, 2023. We don't have -- there's a way to authenticate that I am sure to get some type of certification. We don't have that admittedly. But it is again Exhibit 24 in our exhibit list.

And Exhibit 25 are some excerpts from Mr. Morgan's deposition in the state court litigation that is at issue here. Quite frankly, Your Honor, I'm really not a real litigator, I don't know how to do that, but I could figure it out if we had to get that in. But that Exhibit 25 again is just a few excerpts. It's only really for one minor point.

THE COURT: Well, going back to the 30 exhibits minus two, are we stipulating that those are admitted?

MR. PENN: Yes, Your Honor.

THE COURT: Okay.

MR. PENN: The caveat to that would be, you know, Mr. Morgan is reserving his right to contest the value or assert that the value is greater than the $1.48.

THE COURT: Okay. But those exhibits deal with more the value. That's going to be all those emails with all the attachments.

MR. PENN: Your Honor, beyond -- the only additional exhibit that Mr. Morgan has a concern with is Exhibit 25. We don't contest the accuracy of any of those

statements, but we would want the admission of the entire transcript and not just the limited transcript with those statements.

MR. GLOVER: That's completely fine with us, Your Honor. We can submit it after the hearing.

THE COURT: Okay. So 24 and 25, you don't have an objection to either. Is that what I'm understanding? You want the whole thing.

MR. PENN: Correct, Your Honor. With 25, we would want the whole thing. But we have no objection to those specific statements. And we believe that those are accurate statements.

THE COURT: Okay. Do you have a copy of the whole thing so that -- I mean, how long is it? What are we talking about?

MR. GLOVER: We do, Your Honor. I just don't have a copy today. But we can absolutely submit it to the Court tomorrow. I just didn't -- the -- what is Exhibit 24, the first two or three pages, if you will, until the witness starts testifying and is sworn in. And then it skips to the I think just two pages that we are putting it in the record for. And then it has a -- the signature page.

THE COURT: You want me to read the whole thing.

MR. PENN: Your Honor...

THE COURT: I don't know if it's going to be huge

and it's going to add a whole bunch of facts that aren't part of what we're doing today.

MR. PENN: And I haven't seen the entire thing, Your Honor. I have seen these statements and I think that if Mr. Morgan were asked to verify these statements, he would verify these statements. But...

THE COURT: I mean, we don't always put it into evidence just to -- as a statement of a party.

So my understanding, I'm holding off on 25. And we can always come back to that. But Exhibits 1 through 30 but minus 25, I can go ahead and admit those.

(Exhibits 1 through 24 and 26 through 30 entered into evidence)

MR. PENN: That's correct, Your Honor.

THE COURT: Okay. And then you have some exhibits. Are they in excess of...

MR. PENN: Your Honor, I believe that they are largely duplicative. The Debtor's Exhibit A is the class action settlement.

Did you have any objection to that?

MR. GLOVER: No.

MR. PENN: Any objection to any of them?

MR. GLOVER: No. Your Honor, I have reviewed Mr. Penn's or Mr. Morgan's exhibits A through E this morning,

and I have no objection to them coming in.

THE COURT: Okay. So I don't have any problem with -- I mean, if you duplicate, you duplicate. We can figure that out because you don't have that many that are on your list. So the Debtor Exhibits A through E are admitted.

(Debtor Exhibit A through E entered into evidence)

THE COURT: So then the only thing we have is 25. And you can come back to that and see -- I mean, you may end up not needing it. You may want to use it for cross-examination instead of actually putting it into the record. I’m not sure.

MR. GLOVER: Okay.

THE COURT: So we'll figure that out. And Mr. Penn if your client -- I didn't know if he was having trouble hearing. We do have some things that help. Lots of times in this courtroom people can't hear very well and they put on the headphones. I couldn't tell. I just saw him do this earlier.

MR. PENN: Problems hearing? Would it help --

MR. MORGAN: A little. A little.

MR. PENN: Yes, Your Honor. I think he would accept the audio assistance.

THE COURT: We can give it a shot. Okay, thanks.

MR. PENN: Your Honor, my experience with the system was only when litigants wanted to yell at the judge.

And I don't believe that's the case today.

MR. GLOVER: Your Honor, you may see me -- I have hearing aids. And this -- I turned them --

THE COURT: Well, we can give you -- we have plenty.

MR. GLOVER: I turned them up all the way. I think I can make it.

THE COURT: The sound system here is pretty good, but we're very far apart.

MR. GLOVER: It is very cavernous in here for sure.

THE COURT: Cable. Make sure -- put that date I agreed to be here on my calendar. I don't remember what it is.

MR. MORGAN: I'm good.

THE COURT: Is that good?

MR. MORGAN: Good.

THE COURT: Better?

MR. MORGAN: Well, wait a second. I'm still figuring this out.

THE COURT: Okay.

MR. MORGAN: There we go.

THE COURT: Okay? Good. Okay. So are you ready to proceed? So no live witnesses on your side, or do you have any?

MR. GLOVER: I do not have any, Your Honor.
THE COURT: Okay.
MR. GLOVER: I plan on calling Mr. Morgan and I think Mr. Penn is going to --
THE COURT: So do you want him to do that, call Mr. Morgan first and then you go, or do you want to just go ahead and --
MR. PENN: I'm comfortable with that, Your Honor.
THE COURT: Or you want to just go ahead and call him? I'm not sure which.
MR. PENN: I'll allow the Plaintiff to proceed with their case. If he wants to call Mr. Morgan, he can call Mr. Morgan.
THE COURT: You want to call Mr. Morgan?
MR. GLOVER: I do. Yes, I do.
THE COURT: Okay. And I don't want to get you out of order or anything.
MR. GLOVER: Well, no. I have a little opening spiel, Your Honor.
THE COURT: You can go ahead. I mean, I read everything, but go ahead.
MR. GLOVER: If I can.
THE COURT: Sure.
MR. GLOVER: If I may. I guess I would also start with, I mean, this is bankruptcy court. You know, Wells

Fargo is looking, still looking for a way to resolve this and not, you know, proceed with what I anticipate is going to be a two-hour hearing at least. But I'm not -- and Mr. Penn and I have had some discussions this week about a potential resolution. And it just hasn't come to fruition.

And I know the Court has everything and I very much appreciate that. I don't think there's that many fats that are at issue here. Maybe just one, really. I'm not sure there's any legal points that are at issue, quite frankly. But I guess what this statement is is just a cry for help. If the Court thinks that it could possibly help the parties resolve the issue based on what it's read already. That may be a silly idea. I don't know.

THE COURT: Well, the thing that I don't have is money.

MR. GLOVER: Yeah.

THE COURT: The only way that you solve the problem is with money, and I can't fix that.

MR. GLOVER: Right. Fair enough.

THE COURT: And what I think the whole thing is going to turn on is first if you don't have the means to fund the plan that you filed, then you're not going to be able to do better than that for sure. So, you know, that's my first thought. You say the plan that, you know, you're going to try to get some kind of financing to pay $1.3.

Well, whether it's $1.3 or what else, if you can't get the $1.3, you certainly can't get the other. So I'm not sure that without that piece there's much that the Court can do.

MR. GLOVER: And, you know, Your Honor, that's an important point, I think one that I've overlooked, is that the -- I mean, sure, Wells Fargo could demand the entire $2.176 million, right? But the swing here if you will, the differential is really I value the property $1.48 and $1.3. It's only $180,000, right? And I've continued to think during this case, at least until maybe the last couple of days, that we could possibly overcome that. But we just haven't been able to.

THE COURT: Well, you've also weighed your deficiency as well.

MR. GLOVER: Well, that's true. But I think -- I mean, based on what I have read that we have -- if we foreclose, we have weighed that deficiency. But not unless and until we foreclose.

But at any rate, I know that may be improper, but --

THE COURT: Well, there isn't any deficiency until you foreclose. I mean, that's what I understood. If you would foreclose, you would not be able to collect the rest of the money from this individual.

MR. GLOVER: Correct. That's right.

THE COURT: You know, the other thing, stepping outside of the plan, is if he doesn't pay it off in full, clearly he's going to propose to make payments. I don't know if he has the ability to make payments and I don't know if your client is willing to accept it. I mean, that's the only other resolution that comes to my mind.

That's not what the plan says, though, that you're going to do, that you're looking -- another investor is where -- you know, lender. So I was going to be interested in hearing the success of that. Because it all turns on that. You know, the other option, you sell the property, short sale. And you all have already thought about all this stuff. I'm not sure I have anything to add. It's like a lot of cases, it turns on do you have the money to do it or not.

MR. GLOVER: Fair enough, Your Honor. I'll proceed if it's okay with the Court.

THE COURT: Okay.

MR. GLOVER: Your Honor, I thank you again, Glenn Glover for Wells Fargo, for admitting me to the Court. I think it's the first time I've been in South Carolina live.

But I wanted to start with maybe a silly anecdote, a lesson that I learned a long time ago. The first 15 years of my career I was a commercial bankruptcy and workout attorney. And about eight years ago, I switched to

financial services, which is almost all consumer. And so I've seen it from both sides.

But the lesson that my very first client told me actually about my third or fourth year of practicing law was that occasionally you are going to come across borrowers who are simply -- they will never surrender. They will never pay you, they will never allow you to recover your collateral. They will continue to live in it or to use it unless and until a court of law or a series of courts of law tells them otherwise. And I have come to the conclusion now, especially after seeing the plan that was filed on March 4th, that Mr. Morgan is one of those borrowers. And that's -- you know, I'm not trying to slur him or anything like that. I think that is he not going to leave that house unless and until a court of law tells him.

But how did I get to that position? And I think giving you just a brief overview or background of kind of where we got to where we are today I think would help.

Mr. Morgan lives in a really nice home. A really nice home. The Court has read everything. It's seen the pictures and the two appraisals. It's really large. Twenty bedrooms, ten bathrooms, horse stables, a pool, et cetera, et cetera.

The problem for Mr. Morgan is he had to borrow money to acquire that home, which he did in 2008. He very

quickly went into default and to this day he's not made a single payment on the loan since 2011, some 13 years ago.

For whatever reason -- I wasn't involved, although it's not atypical in my practice -- Wells Fargo didn't file the state court action until 2015. As soon as it did in 2015, Mr. Morgan filed multiple lender liability counterclaims. That litigation went on for eight years. And ultimately the parties mediated it in March of 2023 and they reached an agreement to end the litigation.

That agreement had two really valuable pieces of consideration for Mr. Morgan. One of them was a $200,000 payment. In the world that I practice in, financial service bankruptcy litigation, Your Honor, that is a really, really large payment. I know that it wasn't a bankruptcy lawsuit necessarily, it was just a regular consumer plan of litigation. But it was a large payment. I don't know the merits of the case. I know Mr. Morgan had an excellent state court attorney. But it is a large payment.

The second piece of consideration that he got which was potentially more valuable to him was he received a right to pay Wells Fargo $1.3 million on or before September 4th 2023 and walk away from the debt. At that time -- I haven't calculated the number, Your Honor, but I'm thinking it was somewhere around $2.1. And so $2.1 and $1.3, that difference is $800,000. That is a huge benefit that he

could have taken advantage of during those five months that he had from the end of the mediation until he filed bankruptcy, but he didn't. He did not do it. I'm not really sure what he did. I know he made some efforts. But, I mean, I don't have evidence of that or anything. But I do know he made some efforts. But nevertheless, he filed bankruptcy on September the 5th.

I didn't get this referral until late September from Wells Fargo. But during my first call with them, they made it very clear to me that they didn't want to immediately move for stay relief or move to dismiss the case. They were hoping to reach a deal with Mr. Morgan.

I made relatively prompt contact with Mr. Penn and told him that, that we were still interested in making a deal. And maybe even at that point had we been able to do something very quickly, maybe they would have accepted $1.3 million even though that right had expired on September the 4th, the day before he filed bankruptcy case.

Went on and on. Mr. Penn and I had three or four conversations, maybe the fall. And I got the strong sense that Mr. Penn was trying to persuade Mr. Morgan to sell the home. I know everyone has a right to live in whatever home they want to in this country. But it is a 10,000 square-foot home and Mr. Morgan is an older gentleman. And it makes all the sense in the world I think to many -- maybe

not to him, but to many others that that would be the best thing for him.

It became apparent to me at some point in November of December I suppose that this wasn't going to happen. And by the end of the year we didn't have any resolution. We didn't have any details and concrete plans or anything like that. And Wells Fargo instructed me to file the two motions, which we did in mid-January.

The response that we got I guess late January or early February, instead of saying something like we're working on it, we're doing our best, hey, here are some details, we received an allegation in the response that he made certain handwritten changes to the settlement agreement and that he was not bound by the settlement agreement.

Now, he didn't tell us what those handwritten changes were. To this day, we don't really know what they were, at least in the filings in this Court all we know is that he alleges that he made handwritten changes and the settlement agreement, the final settlement agreement that Wells Fargo says is the final settlement agreement is not what he agreed to.

We filed a -- well, before we did that, I realized the deadline for filing the plan was coming up. Mr. Penn and I talked and we thought it would be a good idea. He told me he was going to file it by March 4th. I said, well,

let's just continue the hearing or ask the Court to continue the hearing. Because at least we'll know by mid-March we'll have a plan. I was certainly hoping that the plan would have some details on a sale or a proposed refinancing. I'm sure Mr. Penn was as well. Can't speak for him. But instead, it had almost no details. The only specific information about this proposed reverse mortgage refinancing is the name of two entities that he's speaking with. That's it. Nothing else.

And so going back to the lesson that I learned as a young attorney, all of these reasons and the chronology is why I am where I am today, which is I think Mr. Morgan is one of these borrowers. I don't think he's going to get out of his home unless and until a court forces him to do so.

So, Your Honor, as I mentioned earlier, I'm not sure many things are at issue today. I really don't think Mr. Penn and I have any disagreement on the legal rules that I cited in our filings. I don't think. Maybe he does. And I'm not sure that there's any factual dispute other than this -- maybe it's a quasi-factual or quasi-legal dispute about when and if that $1.3 million short payoff right had an expiration date.

But several things to point out I think which I think are uncontested. Number one, if he doesn't have that right, then he has to pay us to treat us in his plan by

paying us the entire $2.176 million of our claim.

The reason I'm saying this, there was something in one of his filings that I wasn't really sure if he was trying to argue otherwise. Maybe he's not. But the documents say that Wells Fargo -- there's no obligation by Wells Fargo to release any portion of that claim unless and until it foreclosed. As of the petition date, it had not foreclosed. So therefore, the proof of claim that we filed is $2.176 million. At the modification clause under 1123(b)(2) I think, (b)(5) -- they are different from 1322 -- says that he can't cram us down to the value of the home, he can't bifurcate the claim into a secured portion and an unsecured portion, and he has to pay us in full.

And I don't think that there is any contention from Mr. Morgan that he has any means of paying us $2.176 million. Right? The point is if he doesn't have that -- continue to have that $1.3 million payoff option, he has no chance of confirming a plan and this case should be dismissed right now.

The second point that I think is important to make -- and we're going to get into this -- is that this notion that he didn't agree to the settlement is frankly -- it borders on the absurd. We have an affidavit in the record, as I said earlier I think -- I'm getting out of order in my mind -- from Stacie Knight, a partner at Winston Strawn,

detailing that she rejected the very change that he wanted, that he now says is valid, and sent a redline back to Mr. Morgan's attorney. Mr. Morgan replied back and said okay. And the next day we get that version of the settlement agreement executed by Mr. Morgan, which Wells Fargo ultimately signed.

So that second point again is I think the evidence is overwhelmingly against Mr. Morgan's position on that payoff right, or short payoff option, I should say.

The third thing, which may be the most important, I'm not sure, is that even if he retains the $1.3 million payoff right, okay, his plan as filed cannot be confirmed. It doesn't come close to meeting the standard of 1129(a)(11), the feasibility requirement. As I said, there is nothing in the plan except for the names of two entities with whom he's speaking regarding how he's going to obtain a reverse mortgage loan for $1.3.

Another fatal flaw in his treatment of Wells Fargo is that there's no deadline to accomplish that. It literally says, "As soon as practicable during the plan." That doesn't -- no plan can be confirmed to give an open-ended deadline for paying it off like that. I don't think Mr. Penn would disagree with that.

Another part of the plan, which Your Honor -- and I'm using this phrase simply because other courts have used

this phrase. The phrase is pie in the sky. His plan to earn $125,000 a year for the next three years, most of which he is going to use to pay off Dr. Fitch's claim of $180,000, his plan that he's going to get that revenue or income from his company, Harbor Capital, is preposterous. He has already testified in the meeting of creditors and in the state court deposition that -- that's really the reason I wanted to get this on the record -- that harbor Capital is defunct, it's not operating anymore. The last it did was in like 2016 I think the evidence will show. And moreover, his statement of financial affairs shows no income going all the way back to January 1st, 2021 for Harbor Capital.

So the notion that he is at age 78, 79, I think almost 79, is going to go back to work when he hasn't been operating that company since 2016, '17-ish, it's just -- it's not credible. And for that reason, that is another reason that his plan is not feasible.

Your Honor, I guess my last point is that I would fully expect Mr. Penn to request an opportunity to file an amended plan. That makes sense to me. No shocker to anybody. And normally in most situations I would advise my client not to oppose it. It looks bad. Everybody ought to get another shot. I get it. But in this case, in this rare case, we do oppose it. He had five months from the mediation until the bankruptcy to come up with -- to either

take care of or come up with a real plan to do so. He has now had six-and-a-half months since he filed bankruptcy to do the same. And all we have is a naked statement that he's going to get a $1.3 million reverse mortgage loan. And he mentions two creditors or two entities with whom he is speaking.

There is no reason in the world to think that we're not going to be back here at some other point. And maybe -- I don't know what could happen with respect to rolling the disclosure statement and the plan, hearing all into one, but we don't want to do that. You know? We don't think he has shown any reason for the Court to grant him an extension.

And, Your Honor, I think that's all I have. If the Court has any questions, I think all of that that I said is going to be -- is borne by the evidence in the record. The filings in the record or what Mr. Morgan will testify to. And I appreciate the Court's attention.

THE COURT: Yes, sir.

MR. PENN: Your Honor, I would object to any statements in that -- or all the statements in that opening statement that were with relation to settlement discussions that are protected under Rule 408 and I would ask that they be stricken.

THE COURT: Well, I've already heard them. I

mean, it's a little late. They came out of his mouth and I heard them. But I'm not sure which parts of it were about settlement discussions.

MR. PENN: Thank you, Your Honor. I believe specifically it was reading discussions that...

THE COURT: What led him to form his opinion about him not getting out of the house?

MR. PENN: Correct, Your Honor. And the specific discussions that took place in the fall and in January.

MR. GLOVER: Your Honor, and I want to be clear also. I may have misspoken. But Mr. Penn never told me I have advised my client this and I have encouraged him to do this. And I think I said it this way -- I should have -- is that that is the strong impression that I got from the conversations that I had with Mr. Penn. I am not privy to what he told -- his discussions with his client, nor did Mr. Penn ever tell me that.

THE COURT: Well, all that as just opening statement as I understand it. So it's not evidence anyway. So we're not really at a -- I understand you're objecting to it, but it's not any evidence anyway until it comes out of these exhibits or a witness's mouth. So it's nothing for me really to consider. I mean, I don't think I need to strike it.

MR. PENN: Okay.

THE COURT: It's just whether I consider it or give it any weight.

MR. PENN: Yes, Your Honor.

THE COURT: Okay. Do you want to make opening statements?

MR. PENN: Happily, Your Honor. Harrison Penn on behalf of Michael Morgan, if it pleases the Court.

Mr. Morgan is here today in a continuation of a process, an unfortunate process for him that began when he refinanced his home with Wachovia Mortgage in 2008. Shortly after the refinance of his home, the national economy fell into a housing crisis. And as you read the history of this case and the prior opinions in this case, it brings a lot of government relief programs like the HAMP program and the TARP program back to a top of mind.

But, Your Honor, this is a continued situation of an agreement that Mr. Morgan made where at that time it was Wachovia Bank acted badly, made misrepresentations, and admitted a degree of fault in the settlement of a class action. It's Mr. Morgan's position that following that settlement, Wells Fargo failed to honor the terms of the settlement.

THE COURT: Doesn't that settlement agreement say that the court that entered the settlement agreement maintained jurisdiction to monitor compliance and that the

lawyers in that proceeding had to -- he had reports (indiscernible) was turned down for a loan modification?

MR. PENN: Your Honor, it does say that there were reports necessary and --

THE COURT: Had somebody complained to them? Am I going to hear that in the evidence?

MR. PENN: Your Honor, you will hear that in the evidence, that Mr. Morgan did complain. And you will hear in the evidence from Mr. Morgan that his counsel retired after receiving a $50 million payout from the settlement. And that --

THE COURT: But what does that matter? I mean, there's a release since that time. I mean, why does any -- I understand how he got here. I read it. But how we're moving forward is the point. So, I mean, I will let you continue. But at the same time, that's not going to persuade me. What I need to know is how are we moving forward from where we are right now.

MR. PENN: Thank you, Your Honor. And from Mr. Morgan's perspective, the largest part of this challenge has been a continually moving goal line in terms of what the necessary payout would be. And, Your Honor, I think when you hear the evidence today, you'll understand that the proper payout for Wells Fargo would be $1.3 million until just prior to foreclosure.

THE COURT: So do you have it?

MR. PENN: At present today, Your Honor, I do not have -- Mr. Morgan does not have $1.3 million.

THE COURT: I mean, that's what it's going to come down to. Let's say it is $1.3. You know, do you even have it? Are you going to be able to get it? When are you going to be able to get it. We can't just postpone that foreclosure forever, even if I agreed with your position.

MR. PENN: And I understand that, Your Honor. And Mr. Morgan is here today to testify on his own behalf in the efforts that he's taken to obtain that mortgage and what he believes to be the likelihood of success in that reverse mortgage process.

And so with that, Your Honor, the Debtor is happy to proceed into evidence.

THE COURT: And you object to their claim yesterday? I mean, you say -- you think as of this very moment in time their claim is only $1.3 million?

MR. MORGAN: Yes.

THE COURT: Sorry, you need to not speak. Your attorney speaks for you. And you can talk to him. When you're on the witness stand, you'll get an opportunity to speak.

But, I mean, as we sit here right now, the claim is only $1.3 million. Isn't there some contingency to that?

MR. PENN: Your Honor, I don't believe that that is a contingency when you look at the terms of the mediation settlement agreement. I believe that Wells Fargo should be bound by its agreement to accept $1.3 in satisfaction of that mortgage, $1.3 million in satisfaction of mortgage.

THE COURT: Forever? I mean, something has to happen. But he has to hand the check before that becomes a claim it seems like. I don't know. I'm very skeptical.

And I want to ask you one question now and I want him to address it when he gets on the stand. What happened to the $200,000?

MR. PENN: Would you like me to answer that or would you like Mr. Morgan to answer that?

THE COURT: Well, I mean, I see it on the schedules, that there was a payment. I’m assuming the attorney got some of the money and he got some of the money. And then he still had some at filing. But, you know, still has that money to make payments, adequate protection payments? Has any adequate protection been offered?

MR. PENN: Your Honor, it's Mr. Morgan's position that an adequate protection payment wouldn't be necessary based upon the equity in the home.

THE COURT: For how long? I mean, we're already six months into the case. At what point do you have to start paying something? I mean, it's not just about

depreciating collateral; you've got to start paying at some point. I mean, why not make some kind of -- he asked me earlier and we talked a little bit about some kind of resolution. I mean, why don't you buy some more time, or try to anyway? I'm just curious. You don't get to stay here forever without making payments. And that's about -- bankruptcy court is about making the payments you have to make. So I was just curious about that. It occurred to me earlier, and I wanted to get it out of my head so I can focus on what you're saying. What happened to the $200,000?

I'm sorry.

MR. GLOVER: I was just -- I thought you were going to call on me.

THE COURT: No.

MR. GLOVER: Sorry, Your Honor.

THE COURT: Go ahead.

MR. PENN: Your Honor, it's the Debtor's position that adequate protection would be due to the extent that there is a diminution in value. And, Your Honor, it's the Debtor's position that this is an asset that's continuing to appreciate and not depreciate.

THE COURT: So he's refusing. That's what you're saying.

MR. PENN: No, Your Honor. He is not refusing.

THE COURT: I'll either do it, I won't do it. I

won't do it is refusing. That's refusing to negotiate about that particular issue.

MR. PENN: Your Honor, I accept your position, but I would submit to you that there hasn't been any refusal and there hasn't been a willingness from the creditor to accept adequate protection.

THE COURT: Okay, go ahead.

MR. PENN: Your Honor, we are happy to proceed into evidence.

THE COURT: Okay. Let's go. So you want to call the witness?

MR. GLOVER: I do, Your Honor. I call Michael Morgan.

THE COURT: You can come right up here. Remain standing and be sworn in. You can keep the headphones if you want.

Just remain standing and she'll swear you in.

CLERK: You can keep those on. Do you swear or affirm the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth?

MR. MORGAN: I do.

CLERK: State your name for the record, please>

MR. MORGAN: Michael Morgan.

CLERK: Have a seat. Thank you.

THE COURT: Okay. Make sure you speak up so

everybody can hear you.

MR. GLOVER: Your Honor, I forgot to mention this. I apologize. I forgot to -- apologize. I was under the impression that Mr. Penn was going to send our exhibits over on Friday. That is my fault, not his. I did see the local rules and I read the local rules. And I just -- I wanted to apologize that they came in late. I did my best to follow everything.

THE COURT: Okay. It was not something that we get them and review them or anything. It's just -- keeps from when we have a lot of hearings lets us start on time and puts a little bit of pressure on her to get them marked very quickly. But thank you for the apology.

MR. GLOVER: I understand.

DIRECT EXAMINATION OF MICHAEL MORGAN

BY MR. GLOVER:

Q Would you please state your name for the record?

A Michael Morgan.

Q Mr. Morgan, we met earlier. I am Glenn Glover. I am the attorney for Wells Fargo. How old are you?

A Seventy-seven.

Q Seventy-seven. I got it wrong both ways. And where is your current residence?

A 415 South Chesterfield Street in Akin.

Q And that is -- that home is currently the collateral

for Wells Fargo's mortgage?
A It is.
Q Okay. I know we disagree on the payoff amount or the amount of the loan or whatever. But it is Wells Fargo's collateral, correct?
A Correct.
Q And it's your understanding that Wells Fargo's mortgage is first priority, correct? There are no other liens ahead of Wells Fargo's mortgage.
A That's correct.
Q Okay. And it's also correct that there is a second lien on the home?
A There is.
Q Okay. And that is -- it's Dr. Fitch. Can you explain to the Court her relationship to you?
A We were romantically involved for a long time.
Q I'm sorry?
A You can't hear me?
Q Not very well.
THE COURT: Yeah. You're speaking fairly quietly. But you're doing the right thing. Get the microphone close to you.
BY MR. GLOVER:
A We were romantically involved for a number of years.
Q Okay. She was never your wife.

A Not my wife.
Q Okay, very good. Mr. Morgan, I want to get one thing, an odious thing out of the way very quickly. But it is correct that you were previously convicted of seven counts of federal --
MR. PENN: Objection, Your Honor.
THE COURT: What's the relevance?
MR. GLOVER: It goes to credibility as a witness.
THE COURT: I mean, I don't know what I'm going to hear, so I guess you have to tell me.
Do you want to go ahead and make your argument before he tells me anything else?
MR. PENN: Your Honor, he's going into a past history that I think has no bearing on this, and neither is it credible or would it lead to credible evidence.
THE COURT: Okay. Well, go ahead and tell me why I should hear it.
MR. GLOVER: Your Honor, it's -- I mean, I'll have to tell you what it is. But it is a -- it's a --
THE COURT: Well, tell me how long ago. Start there.
MR. GLOVER: 1991, '92. Suspended sentence.
THE COURT: I mean, I'm trying to tune out that kind of stuff if it's not relevant. So you can go ahead and ask him the question, and I'm going to overrule the

objection. But I will give it whatever weight it's due. And 1991 may be due absolutely nothing.

MR. PENN: Thank you, Your Honor.

MR. GLOVER: So go ahead.

MR. GLOVER: Thank you, Your Honor. I'm hoping to get it in with one question.

BY MR. GLOVER:

Q It's correct that you were convicted of six counts of federal bank fraud in 1991.

A No.

Q It's not correct?

A No.

Q Okay. Could you explain why that's not correct?

A It was two counts of bank fraud and four counts of misapplication of funds.

Q Okay, that is correct. I have lumped it all into bank fraud. So it is correct that you were convicted of two counts.

A I was. I was chairman of a savings and loan association. And when the bank failed, I was indicted and convicted.

Q Okay, very good. That's all I have about that. Mr. Morgan, you stated in your schedules I believe that you owe Dr. Fitch $250,000. Is that correct?

A That's correct.

Q What's the source of that debt? Why do you owe her that debt?

A She had -- I was in the affordable housing business and I would put together investor groups to buy older garden apartments. And Dr. Fitch invested a little bit in a project in Virginia that I did, made quite a bit of money. And a couple of years later, I went to contract on a property in Augusta, Georgia and she wanted to invest in that one. But unfortunately that was 2008 and there was the great recession. And Morgan Stanley, which had been the plan tax credit investor in that project, backed out. And when the bank backed out, the deal fell apart. I had $450,000 invested, she had $250,000. Both of us lost our investment. She was very upset. She was my girlfriend. And to resolve things, I gave her a $250,000 mortgage on my house.

Q Okay. But it's actually correct that she sued you in state court for that amount, isn't it?

A She did, because we broke up.

Q Okay.

A A year later I married someone else. And several months after I got married, she sued me.

Q Okay. It's also true isn't it that that judgement was actually for -- I've got a copy over here -- $422,000, isn't it? It wasn't just for 250.

A I don't recall that.
Q You don't recall?
A No. I'm not disputing you; I just don't remember that.
MR. GLOVER: Your Honor, if I may. This is not in my exhibit. If I may approach the witness and get him a copy?
THE COURT: Yes. I think you're just now refreshing his recollection?
MR. GLOVER: that's exactly what I'm doing.
BY MR. GLOVER:
Q Mr. Morgan, I would like you to take a look at this document very quickly. And if you'll turn to Page 4 of the document. Are you with me on Page 4 of it?
A I am.
Q Okay. Is it not correct that the judgement that was entered against you was $422,000?
A Yes.
Q Okay. And you've not repaid her any amount of that $422,000 since then, have you?
A No.
Q Okay. And if you will flip to the next page, is it correct that the date the Court signed that order was September 19th, 2012?
A Yes.
Q Okay. And are you aware of the fact that judgement

creditors can get post-judgment interest on judgments that they receive?
A No.
Q They're not? Nevertheless, you would agree that you owe her at least $422,000, is that correct?
A Well, that's what this says. So I have to accept that. The note is for $250,000 that I signed.
Q I understand that. But a court of law said that you owed $422,000 in September of 2012.
A Right.
Q And you didn't appeal it, did you?
A No.
Q Let's talk about something that actually we got into a second ago. Is it your contention that right now prior to -- obviously -- kill all of that. Wells Fargo, Mr. Morgan, has not foreclosed yet, is that correct?
A That's correct.
Q Okay. Is it your contention that there's some -- that Wells Fargo agreed in some document to reduce the amount of its total debt before it foreclosed?
A I'm not sure I understand that question.
Q Okay. What I am -- so Wells Fargo filed a proof of claim in this bankruptcy case that is an allegation of the amount that it is owed as of the petition date, which was September the 5th, 2023. Its proof of claim stated that it

was owed $2.176 million. Do you dispute that proof of claim?

A I believe we are bound by the settlement agreement at $1.3 million.

Q Okay. Can you point me maybe later when Mr. Penn questions you -- I don't see anything in any document that requires Wells Fargo to release any amount unless and until it forecloses. But your testimony is you think that there's something in a document that does obligate them to reduce the amount that it's owed before it forecloses; that's your testimony?

A I'm not sure I can answer that the way you framed that. But my understanding is that the mediated settlement agreement obligates Wells Fargo to accept $1.3 million right up until the time of the foreclosure.

Q Period?

A That's what I believe it says, yes.

Q Okay. So again, do you contest Wells Fargo's proof of claim for $2.176 million?

A I have not looked at that and seen how the calculation was made. So I can't answer that specifically.

Q Okay. But you can answer it to say do you have any reason for contesting Wells Fargo's proof of claim right now?

A Well, since my experience with Wells Fargo through

these years has been --
Q I understand, Mr. Morgan. What I'm asking you -- I'm not trying to cut you off.
A I don't accept any of their contentions on their face value.
Q Okay. Do you have any reason to believe right now -- even though you haven't looked at it, I get it. But I need an admission, a statement from you that says I have no -- maybe it's wrong, maybe it's right, but I have no reason to believe that Wells Fargo's proof of claim is not valid.
A I can't give you that unless I did the arithmetic myself.
Q Unless what?
A I would have to do the arithmetic myself. I can't accept your representation.
Q Okay. Mr. Morgan, let's take a look, if you can get that big notebook in front of you. And if I go too fast, please slow me down. It's better if you just lay it flat, Mr. Morgan. You can make more progress turning pages.
Is there any way you can -- is there a little desk behind you that you can put it on?
A I'm audio challenged.
MR. PENN: Your Honor, may I also approach the Debtor with his glasses?
THE COURT: Sure.

THE WITNESS: Yeah, that would be helpful. Thank you.
BY MR. GLOVER:
Q Okay. I got to the point I had to get glasses, and it's always -- I feel your pain, Mr. Morgan.
Let's take a look at Exhibit 27. And it's tabbed. Hopefully you can get to Exhibit 27 relatively quickly. Tell me when you're there, Mr. Morgan. Are you there?
A I'm there.
Q Okay. And you'll see if you turn to the very first page, you see up at the top there's a little header that says Document, Page 1 of 13.
A Yes.
Q Okay. So when I say -- when I call out the page number, if you'll just look up there, you can easily find it.
So let's take a look at Pages 6 to 7 of -- actually -- yeah, that's right. At the very bottom of Page 6 where it says Class Two, Margaret Fitch, M.D. The very last line on Page 6.
A Yes.
Q Okay. And then we go on to Page 7. And this is where in your plan -- let me just read it.
"Peggy Fitch has not filed a proof of claim in this Chapter 11 case. The Debtor is scheduled a claim for Dr.

Fitch based on a recorded mortgage in the amount of $250,000. Accepting the Wells Fargo valuation for the residence at $1.48 million, the Debtor proposed to value the Dr. Fitch mortgage at $180,000. Why is that not a direct -- doesn't your plan rely on a valuation of $1.48 million for the property?
A That was your valuation. That was the appraisal of Wells Fargo.
Q This is your statement. This is your statement here though. This is your plan.
A We accepted your valuation for the purposes of the plan.
Q So -- okay, you accepted our valuation for the purposes of the plan. But you challenge our valuation somewhere else outside of the plan?
A Where?
Q Well, that's what I'm asking. You're saying that we accepted your valuation for the purposes of the plan. Do you not accept it for some other purposes?
A Well, there are various appraisals. Your appraisal was for $1.480.
Q No, that's not the question I'm asking you. I'm asking you is there another reason for which you do not accept Wells Fargo's valuation of the property. That's all.
A Well, my answer would be I had an appraisal

commissioned last summer before bankruptcy that valued the property --

Q I'm not -- I don't want to --

MR. PENN: Your Honor, if he could let Mr. Morgan finish his answer.

THE COURT: Yes.

MR. GLOVER: Okay.

THE COURT: He doesn't seem to be answering. So the question you're asking him is what does he think the property is worth?

MR. GLOVER: No.

THE COURT: No?

MR. GLOVER: I'm asking him -- he has said that he accepts our valuation of $1.8 million --

THE COURT: I mean, I can read it. I'm reading it. That says what it says and I will be able to interpret that as I want to interpret it. But I'm not sure what your question -- you're arguing with him, I guess.

MR. GLOVER: Well, no, I'm --

THE COURT: You're not going to convince him and you're arguing with him is what I think. Ask a direct question about -- try it again.

MR. GLOVER: One last time, Your Honor.

THE COURT: Okay.

BY MR. GLOVER:

Q I understand that you think the property is worth more. For what purposes do you think that increased valuation is relevant?
A For obtaining of a first mortgage.
Q Okay. Good enough.
MR. GLOVER: I'll move on, Your Honor.
THE COURT: Okay.
MR. GLOVER: Sorry about that.
BY MR. GLOVER:
Q So let's continue where we are, Mr. Morgan. You are proposing to pay Dr. Fitch's mortgage claim at -- to pay at $180,000. Is that correct?
A Correct.
Q Okay. And it's correct that the large majority of the funds that are going to be used to pay that $190,000 claim are going to come from earnings from Harbor Capital. Is that correct?
A The money is going to come from Harbor Capital.
Q Okay. Harbor Capital, put another way, is going to receive income for certain services and you as the sole owner of Harbor Capital are going to reap the benefit of that income. Is that a better way to put it?
A It's not accurate. Harbor Capital has relationships with investors through the years when I was more active in the real estate business. And those investors would wire

money to Harbor Capital. Harbor Capital would use it for business purposes. And I expect that one or more of those partners are going to help me by wiring money to Harbor Capital which Harbor will then use to resolve Dr. Fitch's claim.
Q But the money that Harbor Capital will earn --
A It's not income. It would be an advance.
Q Okay. An advance. But that money is going to Harbor Capital is ultimately coming to you because -- that's what I'm trying to get at.
A That's correct.
Q Okay.
A I am the sole shareholder for Harbor Capital.
Q You're the sole shareholder, that's right. The money it makes is money you make indirectly.
A Correct.
Q Okay. That's all I'm trying to get to. So let's look at the Exhibit 28. And we are going to go to the very last page of Exhibit 8. I'm sorry, of Exhibit 28. And that is your budget, plan implementation budget; is that correct?
A I didn't hear that.
Q So the very last page of Exhibit 28 is your plan implementation budget?
A Yes.
Q Okay. And under income, the third line, it shows

Future Advances, Harbor Capital, monthly $10,000 and change and annual $125,000 and change. Is that correct?
A Yes.
Q Okay. So that is -- that's what we're talking about basically here. You think that vis-à-vis your ownership interest in Harbor Capital, you personally are going to make $125,000 over the next three years. Fair enough?
A At least, yes.
Q At least, okay. All right. Let's go to Exhibit -- back to Exhibit 27, I'm sorry. And let's look at Page 10 of Exhibit 27.
A I'm sorry...
Q Exhibit 27. And Page 10, the top of Page 10. Are you with me, Mr. Morgan?
A I am.
Q Okay. The very first full sentence there, it says, "The Debtor's begun marketing its assets and has received a commitment from two insider family businesses for the continued payments of consulting fees so long as such insider businesses remain going concern."
Who are those two insider family businesses?
A Say that again?
MR. GLOVER: I'm sorry, Your Honor. If I could have a second?
THE COURT: Sure.

MR. GLOVER: Okay, let me -- your attorney has indicated to me that there is an error in the disclosure statement.

And just for the record, Your Honor, Mr. Penn has indicated that -- correct me if I'm wrong --

MR. PENN: Absolutely.

MR. GLOVER: That entire sentence that begins "The Debtor" ending with the word "concerns", which is the first word on the fourth line, that that should be removed from the plan.

Fair enough?

MR. PENN: That's accurate.

MR. GLOVER: Okay.

BY MR. GLOVER:

Q All right. But I guess my question still is -- now it's even more mysterious. Where are you -- precisely how are you going to make money -- how is Harbor Capital -- I know you went into it a second ago. How are they going to make money again?

A Harbor Capital was formed in 1990. And it had acquired a number of apartment projects in the southeast. The projects were ultimately owned by single-purposes entities which were established by Harbor. Harbor would collect fees for putting the deals together, sometimes would retain a debt position and share in whatever profits there were on

the back end. And so Harbor did that until 2015 or so. And most deals were quite successful.

Then I basically aged out. Guys that I -- lawyers, brokers, investment bankers all tended to retire. So it became increasingly more difficult for me to do business, but not impossible. I still get dozens of submissions every day of properties to look at and I still have investors who would be interested in participating. So I am prepared to start doing deals.

Q I understand. And I do actually understand the structure of your deals. I think I do. I was a commercial attorney for 15 years before doing this.

But your plan doesn't identify the name of any investors, of any banks, of any potential limited partners. There's literally nothing there except your word that you're going to start it up again, even though you said you've aged out, which you -- by the way, I was going to ask you about that. That's what you said at the 341. Why do you think the court would find that plan, I'm just going to use the legal word feasible, with no supporting documents, no plans, no business plans, no anything?

A That's hard for me to answer except to say that I have a specific investor in mind who has indicated that he is willing to help me in this situation.

Q And who is that investor?

A Well, he would be reluctant to get dragged into this court proceeding, so I am hesitant to tell you. But I will say that he is somebody that I have done business with for more than 50 years.
Q Fair enough. But you do understand when you submit a plan of reorganization in a Chapter 11, that if you're planning on or proposing that you're going to make income from X, Y, or Z source, that you have to provide details, which obviously at the most basic level would include the name of this investor and some type of commitment to do something. I mean, you understand that you -- what I think the Court is going to rule -- I'm not sure, I'm not the judge. But you're going to have to submit something.
A Well, this is my first time in Chapter 11. So...
Q Okay, all right. Fair enough. You're not the lawyer.
MR. GLOVER: I don't know if we need to get in -- I think I can skip a bit here, Your Honor.
BY MR. GLOVER:
Q But in your statement of financial affairs, you indicated that Harbor -- you had not made any money from Harbor Capital since January 1st, 2021. Is that correct?
A That's correct. What little money I got from Harbor Capital, the cash I got from Harbor Capital would have been advances to shareholders, not taxable income.
Q But it would have been advanced to you?

A Yes. I am the sole shareholder.
Q As a distribution or a profit?
A Well, it's not accounted for that way. In some years I might account for it as a consulting fee or as a dividend. But in other years I -- any cash might be accounted for as an advance to shareholder.
Q Okay. And just to be clear, you didn't list any of those distributions, advances that you've just discussed. You didn't list those anywhere in any of your bankruptcy schedules.
A No, because there haven't been any lately.
Q Well, you indicated on your schedules -- I'm sorry, in your statement of financial affairs going back to -- because it asks about the current year and the previous two calendar years -- that nothing -- no line item for Harbor Capital was listed. I just want you to acknowledge what's already in the record I guess.
A Well, I have to acknowledge it. I didn't realize that.
Q Okay. Fair enough. You talked about the fact that you even used the phrase, "I've aged out of the business", Mr. Morgan. And, you know, I think you gave a little more about that. But are you -- is it just your physical ability, your mental ability now that has caused you to age out of the business?
A No. The people that I had years of history with are

retired or dead. So I'm having to meet new people.
Q Okay. If you would look at Exhibit 25, Mr. Morgan. It's Pages 15 and 16. Tell me when you get to Page 15.
A Okay.
Q Okay. And I'm going to represent that this is a document -- I'm sorry, that this is a deposition that was done in November of '22, in your state court deposition. Do you remember being deposed in that litigation?
A I do.
Q All right. Fair enough. At the bottom of Page 15, the very last line or next-to-last line. Question, "Okay. What is its business now?"
You say it's inactive at the moment because of my age and health.
Going on to the next page, Page 16. Question, "Okay, can you elaborate there? What do you mean, because of your age and health?"
Answer, "Well, I'm 76 years old and I have degenerative disc disease so I have trouble walking and standing."
I read that to mean that at least as of November 2022, it was literally your physical condition was preventing you from continuing to operate Harbor Capital. Is that not true?
A Well, my physical condition doesn't help. But the real problem that I have is a lack of business context because of

people retiring.
Q And you don't think that's going to be a problem for you for the next three years?
A Well, I am dealing with people now who are the same age as my children. But no, I don't think it's going to be a problem.
Q Let me ask you this. If this -- and I'm not trying to characterize your testimony as saying you think it's going to be easy. You've been I think pretty clear that it's not going to be easy. But nevertheless, you think that you can make $125,000 over the next three years. Is that correct?
A Yes.
Q All right. I'm doing the rough math. I think that would be roughly equivalent to the amount of a year's worth of monthly mortgage payments on your Wells Fargo loan. Have you made any effort to restart your business up since 2015 or 2016 and repay Wells Fargo?
A I have made repeated offers to pay Wells Fargo the modified mortgage amount that was agreed to in the settlement. And they have refused to accept any of those payments.
And on top of that, I at one point offered them $100,000 to restart. And that was refused. And I taped all of those conversations which were part of the record in the state litigation.

Q Okay. When you say the modification, you used the word modification, are you referring to the prior class action litigation?
A Yeah. The 2010 class action litigation.
Q Okay.
A In that litigation, Judge Fogle, who was the judge who heard the case, in his order approving the settlement, said that Wells Fargo had acted in bad faith or actions tantamount to bad faith. And then when -- they basically refused every class member's modification request.
And there was a second class action. The judge in that case also chastised Wells Fargo for its conduct. So it's been very hard for class members to get their modification. But if I had gotten the modification to which I am entitled, we wouldn't be here today.
Q Were those factual and legal allegations about receiving a loan modification from Wells Fargo, those were included in your lender liability counterclaims in the state court action with Wells Fargo, weren't they?
A Yes.
Q Okay. So -- and you released Wells Fargo as part of the settlement agreement, right?
A Yes. But those weren't my only claims in state court.
Q Okay. But you do understand that when you released Wells Fargo, that you've released them from any claims that

you made in the state court litigation or any claims that you could have made in the state court litigation.
Q No. there were other claims in the state court litigation. And the problem that I saw was that in the class action, we gave up our claims, but then Wells Fargo failed to perform by granting the modification, which made me distrustful of Wells Fargo honoring future agreements.
Q But are you suggesting that there was no recourse for those class action members?
A That was the position that Stacie Knight and Wells Fargo took in all of the subsequent litigation.
Q But nevertheless, to be clear, your claims relating to that modification and the settlement in that class action, they were absolutely part of your foreclosure counterclaims.
A initially, but they were dismissed.
Q Okay. Okay. They were dismissed. All right, fair enough.
Let's turn to the disclosure statement, which is Exhibit 28. And let's look at Page 9 of the disclosure statement. Exhibit 28, Mr. Morgan, Page 9.
A One minute. I've dropped my glasses.
Q Okay. No problem. Take your time.
A Okay.
Q Ready?
A Yeah.

Q Okay. Third paragraph on Page 9 of Exhibit 28. "Debtor is simultaneously working towards an agreement with Nationwide Equities and Long Bridge Capital for a restructuring of the loan and the former reverse mortgage on his residence as set forth in more detail herein below. All right. A few questions about that.

I didn't see any further detail below about this proposed reverse mortgage refinancing. Did I miss it somewhere?

A I don't know.

Q Well, it's your plan. You don't know if I missed it or not.

A I...

Q Okay, fair enough. Let's move on. Other than -- okay. Who are Nationwide Equities and Long Bridge Capital?

A They are both reverse mortgage companies. Initially I was dealing with a mortgage broker who was trying to arrange the financing for me. And that's what I did over the summer. Unfortunately, she failed to perform. This is not an easy loan application. For one thing, there is this litigation history with Wells Fargo which has to be explained. And then there is the fact that I live in a 22-room house with a barn in a small town that -- it's not exactly a cookie-cutter transaction.

And so basically I think that the broker decided that

this was too hard, and she moved on to other things and she left me high and dry.
Q And which one -- was she Long Bridge or Nationwide?
A No, she was Allied First Bank.
Q Oh, I'm sorry. Okay.
A But she had contacted Nationwide. And so after I let her go, I contacted Nationwide. And they were interested, but obviously there had been a failure to communicate. So I started up the Nationwide application by myself. And Nationwide initially approved the loan. It is now going through underwriting, and with an idea of closing soon.
Q When you say approved --
A Tentatively approved.
Q Do you have any -- a piece of paper that evidences that statement?
A My counsel does.
MR. GLOVER: You do?
MR. PENN: Yeah.
MR. GLOVER: What is it? All right, let's worry about it later. Let me keep going.
BY MR. GLOVER:
Q All right. Other than the two statements in your disclosure statement, I'm sorry, the identification of the two potential reverse mortgage financing companies, is there any detail in your plan about the proposed reverse mortgage

refinancing?
A I don't know. I don't think so.
Q Okay, fair enough. Are there any other options -- are there -- other than a reverse mortgage financing, are there any other options you are currently considering to hopefully resolve the Wells Fargo claim?
A Well, I've thought about selling the house. The difficulty with selling the house is that there are about a hundred large houses in Akin that are somewhat comparable to mine. And when they come on the market, which isn't all that often, it takes a long time to sell.
For example, the house next door to mine was on the market for 15 years before it finally sold. So there aren't a lot of buyers for big houses in Akin with a barn. So you've got to be a horse person and you've got to want a lot of room. So that narrows the field down considerably.
So if a buyer just materialized on the scene and made me a decent offer, would I accept it? The answer is yes. But that's probably not going to happen. And so I think a reverse mortgage is the better alternative.
Q Okay. So there's no -- other than -- you just discussed the sale. And of course we have the proposed reverse mortgage refinancing and the plan. No other option that's being considered?
A If you have a suggestion, I'd be happy to hear it.

Q All right, very good. Just as an incident, wouldn't you agree that if a property sat on the market for 15 years, it's probably overpriced?
A Well, I don't know. Peggy Fitch had her house on the market for 12.
Q All right. Fair enough, Mr. Morgan. Let me ask you this. Supposing we get relief from stay and we proceed to foreclosure and you convince this Court that you do have a $1.3 million payoff option up until the time of foreclosure, but you don't make it and we foreclose, what is the harm of that? We've already agreed to a no deficiency foreclosure judgement. You walk away from the entire amount. What is -- what's the difference between selling it and just --
A Well, I think that there's equity in the house.
Q You think there's equity over and above $2.176 or over and above $1.3?
A Over $1.3 for sure.
Q Okay. Mr. Morgan, if the Court --
MR. GLOVER: Your Honor, I would be happy to take a break if you'd like to take a break or if anybody else would like to take a break. I'm fine.
THE COURT: I mean, I'd like to try to finish with this witness.
MR. GLOVER: Okay. All right. Very good.
BY MR. GLOVER:

Q Let's look at -- I just want you to take a look just to kind of refamiliarize yourself, Mr. Morgan, with Exhibit 21, Exhibit 22, 23, and 24. Just take a minute or so, take a look at those four exhibits. Take your time. Take your time. All right, are you ready? Okay, sorry.
So Exhibit 21 is the mediated settlement agreement. Is that correct?
A Yes.
Q Okay. And Exhibit 22 is the May -- what I'm calling the May 2023 settlement agreement, correct?
A Yes.
Q 23 is the stipulation to dismissal of counterclaims that was filed in the state court action. Have you seen 23 before?
A I don't think so.
Q Okay. And then 24 is your July 2023 CFPB complaint. Is that correct?
A Yes.
Q Okay. So your contention in this case, correct me if I'm wrong, is that you have up until the date and time that Wells Fargo forecloses to pay Wells Fargo $1.3 million; is that correct?
A Yes.
Q All right. Fair enough. That's what I thought it was. And, well, let's take a look at 22, Exhibit 22 very quickly.

And it is, Mr. Morgan, 13 of 16 if you look at the header up top. Again, Exhibit 22, Page 13 of 16 up top. Are you with me?
A Page 13 of 16?
Q Yes, sir. At the very top.
A Yeah.
Q It's got the signatures on it.
A Yes.
Q Okay. So this is the fully-executed version of the May 2023 settlement agreement that Wells Fargo says in the binding agreement. You understand that that's our position, correct?
A I do. And that's my signature on Page 12.
Q That was my next question. That is your signature on this page, correct?
A Right.
Q And when you executed that, Wells Fargo had not executed it, correct?
A Correct.
Q Okay. But your contention is that this is not the agreement that you signed.
A That's right.
Q Okay. Let's be very specific here. Your contention is that you had a full settlement agreement in front of you and the last page was the signature page. And you signed that.

Is that your testimony?
A After making a number of changes in the document.
Q A number of changes, okay. In other words, what I want to make sure that I'm not misunderstanding is that you just didn't -- your attorney didn't put a one-page signature -- a signature page in front of you and then explain to you verbally what the agreement was; you had an opportunity to actually look at the document and then sign it, correct?
A What happened was my attorney was in Akin at the Master-in- Equity Court.
Q I'm sorry?
A My attorney was in Akin at the Master-in-Equity Court. And he told me to meet him there. So I went over to the courthouse. He showed me this document. I objected to a number of items in it. I made changes, crossed things out, signed the document, and told him to make my corrections. The final document here does not have any of those changes.
Q Okay. But let's -- understood. And I don't want to get out of order in my mind. But I think those answers are going to be responsive to a couple of questions I ask later.
Let's go back to Page -- it's Paragraph 8B, Mr. Morgan. Hold on. It's Page 4 of 16 at the top, Page 4 of 16 at the top. Okay, are you with me?
A Yes.
Q Okay. Paragraph 8B. I'm reading -- the title is

Morgan Settlement Payment. "On or before September 4th, 2023 at 11:59 p.m. EST Wells Fargo will accept payment from or on behalf of Morgan in the form of certified funds or wire transfer in the amount of one-million-three-hundred and no dollars." Probably should have had them in thousand. At any rate, "1.3 million in exchange for the release of the mortgage in full satisfaction of the loan." That is what it says, is that correct?
A It's what it says.
Q Okay. But it's your testimony that the document you signed that you -- did you make a handwritten change to this particular sentence?
A Crossed it out I believe.
Q Okay, all right. Let's take a look at Exhibit 21. Exhibit 21, Mr. Morgan, is the mediated settlement agreement. Is that correct?
A Yes.
Q Okay. So let's look at Paragraph very quickly. "The parties will execute a general mutual release releasing the other and the other's employees, agents, attorneys, insurers, and related parties from all claims and damages. Paragraph 4 of the release will include a comprehensive contractual confidentiality and non-disparagement provision for which the sum of $100 paid to such in Paragraph 1 is allocated." Okay.

So it is correct that this mediated settlement agreement was signed on March 31st did call for a subsequent document to be entered into, correct?
A Yes.
Q Okay. So you don't dispute that.
A No.
Q Okay.
A But I dispute that this May document was what I expected to be the subsequent document.
Q Understood. Understood. So -- and I don't think we need to look at this. I'm just going to -- this is on -- for the record, on Page 4 of Exhibit 30, which is your objection and response to our motion for relief from stay. It's also on Exhibit 27, page 6 of Exhibit 27, which is the disclosure statement. Both of those are filed in the case.
You stated word-for-word the same thing. And I'm just going to read it. And I quote, "The Debtor handwrote changes on the document and signed the May 24th, 2023 agreement as revised. The settlement agreement signed by Wells Fargo on May 26th, 2023 does not include the changes made by the Debtor on May 24th, 2023." Okay. Is that --
A Yes, that's true.
Q I mean, you authorized that statement to be made.
A Yes.
Q Is that correct?

A Yes.
Q Okay. Let's go back to Paragraph -- I'm sorry, Exhibit 22 again, which is the settlement agreement, the final version according to Wells Fargo. And let's look at Page 6 of 16. Are you with me?
A Yeah.
Q Okay. Paragraph 12. Morgan's Release of Wells Fargo. I am not going to read that. But arguably that's the most important thing in this document. You're not in any way alleging that you haven't released Wells Fargo, are you?
A I don't think this agreement is valid. So anything in it I would dispute.
Q You think every term and condition in this settlement agreement is not binding upon you?
A Right. It's --
Q Are you prepared --
A I am bound by the mediated settlement agreement. I am not bound by this document because this is not the document that I was expecting or prepared to sign.
Q I thought you might say that. I also thought you might say that, well, I'm not bound -- I'm bound by anything that I didn't change, but anything that I handwritten changes on I am not bound by. But that's not your position.
A Well, I mean, I hadn't thought that far ahead. But this -- I don't want to be bound by this agreement in its

entirety. Wells Fargo defaulted on the first agreement when they failed to send me the $200,000 by April 30th. So I was skeptical that anything in this document they would live up to. And they -- what they led off with in this document is that they needed another two weeks before they would send the promised money, which at that point was six weeks late. So I scribbled in that this agreement would not take effect until the receipt of funds.

Q Scribbled it in on the mediated settlement agreement?

A On the confidential settlement. On the May agreement I said that this document wasn't valid until I received the promised money.

Q Okay. So that's one alleged handwritten change that you made in addition to making the change about the September 4th expiration of the $1.3 million payoff.

A Correct.

Q What else did you change?

A There was a number of sections. I can't give you the cites exactly. There were a number of sections about litigation, contacting the government. I crossed all of those out.

Q Confidentiality provision maybe? Confidentiality provision maybe?

A Maybe. But there was one -- let me look. Oh, the dismissal with prejudice.

Q I'm sorry, what paragraph is that, Mr. Morgan?
A That's Paragraph 3 on Page 2. So in Paragraph 2, I crossed out the within 14 days provision and put a note in the margin that the agreement would not be valid until the receipt of the money. Then dismissal with prejudice, I crossed that out. And then there were some other sections further along.
Q But why did you cross out the dismissal with prejudice?
A Because I don't trust Wells Fargo. They have broken three different agreements with --
Q Well, why would you ever enter into an agreement with them?
A Because we're in litigation and I want to get this resolved. I want -- if Wells Fargo had lived up to the original settlement agreement in 2010 and I would have been paying my modified mortgage payment for the last 14 years. Instead, they stiffed me and everybody else in the class.
Q I understand. But going back to Paragraph 3, it says within five business days of receipt of the Wells Fargo payment. That's $200,000, right?
A Right.
Q That's what is defined, that you'll dismiss your counterclaims. Why in the world would you not --
A I wanted to reserve my rights. I mean, because I didn't believe Wells Fargo would perform.

Q You understand that no party is going to enter into a settlement agreement unless it thinks it's final for all -- I mean --
A I understand that, but I also understand that in the very first settlement agreement --
Q I know. We've --
A -- the class members gave up all their rights.
Q I understand.
A And then Wells Fargo didn't perform.
Q I understand.
A So my risk here was I give up all my rights and, you know, two weeks goes by and Wells Fargo doesn't make the payment.
Q Okay. So we've got -- correct me if I'm wrong. You made one change about that it's not enforceable unless and until you receive the check. You made a second change that you killed Paragraph 3 because you didn't want to dismiss your counterclaims even after you got the payment. And then number three was that you're saying that in Paragraph 8B, you killed the September 4th deadline --
A I don't remember if I crossed that one out. But my view is that the disagreement is either a hundred percent applicable or zero percent. If one part is wrong, then it's all wrong.
Q That's your opinion, right?

A Correct.
Q I'm sorry, Mr. Morgan. Okay. But I do want to get a list for the record since you have -- I mean, you understand why it's important to me, right Mr. Morgan, to get a list of the alleged handwritten changes. I'm just trying to take an inventory, that's all.
A Well, unfortunately I didn't retain a copy of the document that I marked up.
Q Okay.
A I gave it to my lawyer. He didn't have a copy to give me. And, you know, I have never seen it since.
Q Have you asked your attorney? Did he make a copy of that document?
A I have -- the conversation I had with my attorney after I've received this document was that this was not the document that I had signed.
Q I understand that. But my question is did you specifically ask him, Drew, did you make a copy of the agreement with my handwritten changes on it?
A No.
Q Did you ask him?
A I don't believe I did, no.
Q Okay. Is it possible that he has -- he made a copy of it and still has it and can deliver it to all of us?
A Very possible.

Q Okay. But you just don't know.
A I just don't know.
Q Fair enough. So again, just to be clear, you've listed three, I think the record will reflect. You can't remember any other changes right now.
A There were other changes.
Q There were other changes, but you just can't remember them right now.
A Well, some of them are referred to in the Consumer Financial Protection Bureau complaint.
Q Yeah, no. We're going to get to that in one second. Absolutely. All right. Let's take a look at -- well, right now actually, Mr. Morgan. Exhibit 24. Tell me when you're at Exhibit 24.
A I'm there.
Q Okay. Let's look at -- it's Page 2, down at the bottom of Page 2.
A Yeah.
Q First sentence, second sentence.
A Yes.
Q Down towards the bottom. Actually, the last sentence. "It appears that Wells Fargo attached the signed signature page to their proposed document." All right. So that is an outright allegation that Wells Fargo has committed fraud upon you in this process, correct?

A And the Consumer Finance Protection Board fined Wells Fargo $3.7 billion --
Q I understand.
A -- for improper denials of mortgage modifications and wrongful foreclosures.
Q Okay. Did that have anything to do with faking borrower signatures on settlement agreements?
A I don't know what the detail is, but I wouldn't be surprised. They've -- I discovered in my state litigation that they had forged my loan application.
Q Okay. Good enough. Let's take a look at Exhibit 5 very quickly, which is Ms. Knight's affidavit. And then if you could kind of go to Exhibit 16, Mr. Morgan, and hold your place. Because we're going to unfortunately flip back and forth a bit.
All right. So Exhibit 5, Paragraph 23. I'm sorry, it's on Page 7 of 8, Mr. Morgan. Exhibit 5, Paragraph 23. Are you there?
A I’m getting there.
Q Okay. Paragraph 23 -- by the way, you met Ms. Knight, right, at the mediation?
A I have.
Q Okay. And you are personally -- you've met her. You have a personal relationship with her. You know her.
A I don't think I have a personal relationship.

Q Okay, fair enough.
A I've been in court with her.
Q You've been in court with her. You've met her in person more than once?
A Yes.
Q All right, very good. This statement in Paragraph 23 says, "On May 25th, 2023, I received by email from Mr. Radeker in which he stated, 'Stacie, attached is the agreement signed by Mr. Morgan. True and correct copies of Mr. Radeker's email and attached hereto as Exhibit A11.'" All right.
Because I have tried to make things more complicated, Exhibit 16 and the record today is actually Exhibit A11 to her affidavit. Let's take a look at Exhibit 16 very quickly. And the first page there of that exhibit, that's an email from your attorney, Mr. Radeker, to Stacie, Wells Fargo's attorney, that says, "Stacie, attached is agreement signed by Mr. Morgan." Is that correct?
A Yes.
Q And that's exactly what she had in her affidavit; is that correct?
A Yes.
Q All right. Let's take a look at the attachment to that email. It's still Exhibit 16. And let's go to Page 12 of 21, Mr. Morgan, at the top. 12 of 21 at the top. Paragraph

8B. Exhibit 16, Page 12 of 21, paragraph 8B. It says -- I'm sorry, are you with me?
A I am with you.
Q "On or before September 4th, 2023 at 11:59 p.m. EST Wells Fargo will accept payment from or on behalf of Morgan in the form of certified funds or wire transfer in the amount of $1,300,000 in exchange for release of the mortgage in full satisfaction of the loan." Is that correct, Mr. Morgan?
A That's what it says.
Q Okay, that's what it says. That's what this document says. So you understand that Ms. Knight has testified that your attorney emailed her this copy of this document with your signature on it. Is that correct?
A Yes, yes.
Q Okay. You understand that.
A Well, I also understand there is this whole email exchange that I saw between them where Drew keeps telling Stacie that I have changes, but I never see any acknowledgement.
Q Oh, we're going to get to that.
A Okay.
Q It's in here. It's in here. We're going to get to that. But again, I think you said I understand that. But let me ask it again. Just --

A I don't agree with it, but --
Q Oh, you don't agree with it, I know. But you understand that that's her testimony.
A Yes, I do.
Q Okay. In what way do you think that testimony is false?
A I'm sure she is testifying as truthfully as she can be. But I am testifying that this is not the agreement I signed.
Q How is that fraud on Wells Fargo's part?
A I don't know.
Q Well, no, I'm asking you.
A I don't know. I don't --
Q If you accept her --
A I don't know who is responsible for the final document being not what I signed.
Q That's not -- what I'm asking you is assuming her testimony is correct that your attorney sent her a copy of this document with a deadline for the payoff, short payoff, and you signed it, which you've already acknowledged that you did, how is it fraud on Ms. Knight's part or Wells Fargo's part? How?
A I don't know what happened between Drew and Stacie. So I can't say to you that it's her fault or his fault or that they were doing this together. I have no idea. All I know is this is not the document I signed.

Q Okay. So you do not contest her affidavit testimony on this point in any way.
A I have no -- I have no way of knowing.
Q Again, you have no information or no basis to contest her testimony on this point.
A Correct.
Q Okay. Thank you.
A I have no way of knowing.
Q Okay. Let's go back to your CFPB complaint, Exhibit 24. I think it's Exhibit 24. Hold on. Let's talk about the specifics in here. Page 2 again, Mr. Morgan. Okay.
Let's go down -- I didn't count the lines, I'm sorry. I think it's Line 9 on the right side. The sentence begins with, "I also objected".
A Yes.
Q Okay. Again, this is your statement in your July 2023 CFBP complaint, Exhibit 24 for the record. "I also objected to Sections 12, 13, and 14 of the agreement because they had never been discussed during mediation. Right. Let's flip back to Page -- sorry, Exhibit 22 and let's see what Paragraphs 12, 13, and 14 were. Let's go to Exhibit 22, Page 6 of 16 of Exhibit 2. Are you with me? Sorry.
A Say it again? Where are we on -- it's 12?
Q Page 6 of 16 at the top.
A Yeah.

Q Okay. Paragraph 12 is your release. Is that correct?
A Yes.
Q All right. Let's flip the page. Paragraph 13 is confidentiality. Is that correct?
A Yes.
Q And Paragraph 14 is a non-disparagement clause. Is that correct?
A Correct.
Q Okay. So that's what you were complaining about in your CFPB complaint, correct?
A Yes.
Q All right. let's take a look at document Exhibit 21, which is the mediated settlement agreement. Okay?
A Yeah.
Q Are you with me, Mr. Morgan?
A Mm-hmm.
Q Okay. All right. Paragraph 3 again, "The parties will execute a general mutual release releasing the other," et cetera, et cetera. Paragraph 4, "The release will include a comprehensive contractual confidentiality non-disparagement provision. All right. You state in your CFPB complaint that these provisions were not discussed at the mediation. Is that correct?
A Yes.
Q But not only were they discussed, they are in the

agreement.
A Well, they were not discussed. They may be in this agreement. But I -- the conversation during the mediation was not about Sections 3 and 4, it was about Sections 1 and 2. The payment of the $200,000 and the acceptance of the $1.3 million as the payoff. That's what the mediation focused on. These subsequent sections were included in this language, but they were not discussed.
Q All right. Let me ask it one more time and I'll move on. You made a complaint to the CFPB on July 12th 2023 that stated the release, confidentiality, and non-disparagement sections of the settlement agreement that you signed were not discussed during mediation; is that correct?
A That's correct.
Q And there in plain detail in writing is a mediated settlement agreement that contains -- it calls for a subsequent document to be executed that would contain those three provisions, and you signed that document; is that correct?
A Yes.
Q Thank you.
THE COURT: Okay. It's clear we are not going to finish with this witness and we'll need to take a break. So I don't know if we want to do it at the end of your direct or go ahead and take one now. So how much longer do you

have on direct?

MR. GLOVER: Twenty minutes, Your Honor.

THE COURT: Okay. And I'll remind you, you don't have to go through every single exhibit with him. They're already in evidence.

MR. GLOVER: Yeah. I am trying to skip as much as I can. I'm fine with a break now if it's a very quick one or...

THE COURT: Okay. I think we probably should. I need to give the court staff a break and an opportunity to eat something.

So how long of a break do you need? We can probably get by with 30 minutes because we're in-house. But you guys are not. So what kind of break would you like before we get started again.

MR. GLOVER: I could run and use the restroom, but I don't have to.

THE COURT: Okay. Thirty minutes then. We're going to eat some food. Yes.

MR. GLOVER: Oh. I am so sorry, Your Honor. I missed -- I missed that entirely.

THE COURT: They've been in here since 10:00. So I've got to give them a break.

MR. GLOVER: That's fine.

THE COURT: So is 30 minutes enough for you? We

can live with 30, but I'm not sure if the rest of you can -- if that gets you anything to eat or whatever you might need to do.

MR. PENN: Your Honor, despite my size, I don't have much of an appetite today. I could -- but Mr. Morgan may. So perhaps an hour would be suitable.

THE COURT: Okay. I mean, that's fine with me. We'll be here anyway. So we'll come back -- it's 1:26. So let's go ahead and take a break and come back at -- we'll do our best to get her around 2:20 or so. And we'll wait for you if you're not here though. Don't worry about that if you're running down the street. We'll wait for you. Okay?

MR. GLOVER: Very good, Your Honor. Thank you.

CLERK: All rise.

THE COURT: Sir, you can step down.

(Recess)

CLERK: United States Bankruptcy Court for the District of South Carolina is now back in session. The Honorable Helen E. Burris presiding.

THE COURT: Please be seated. You let the birthday girl go.

MR. PENN: Your Honor, would you like for Mr. Morgan to resume the stand?

THE COURT: Yes. You can come back up, sir. And I will remind you that you are still under oath.

Okay. And we are in the process of the direct examination. Go ahead.

MR. GLOVER: Thank you, Your Honor. And I will do my best to move along as quickly as possible.

BY MR. GLOVER:

Q Mr. Morgan, if you would take a look back at Exhibit 24, at Exhibit 24 again, which is your CFPB complaint.

A My hearing aid isn't working. There we go. All right. You'll have to repeat the question. My hearing aid wasn't working.

THE COURT: He said his -- you're talking about this thing?

THE WITNESS: Yeah, yeah. It's working now.

THE COURT: He just said repeat the question.

BY MR. GLOVER:

A If you would please repeat the question.

Q If you would take a look at Exhibit 24, Mr. Morgan, which is your CFPB complaint. And specifically the second -- actually, Page 3 of 6 at the top.

A Yes.

Q Okay. Are you with me?

A Yeah.

Q Okay. The third sentence, actually fourth sentence -- well, third sentence. "I signed a settlement agreement during a brief meeting with my attorney on 5/24/23." That's

the meeting that you've talked about that actually took place at the courthouse?
A Yes.
Q Okay. Next sentence. "However, I changed and initiated the dates in Section 5 from September to October because Wells Fargo has paid -- failed to pay the promised $200,000," et cetera, et cetera.
A Right.
Q All right. Let's take a look at Exhibit 22 real quickly. Exhibit 22, Paragraph 5. Are you with me?
A Yes.
Q Okay. There are no September dates in Paragraph 5, Mr. Morgan. I've just assumed all along you really meant Paragraph 8 in your CFPB complaint.
A I must have. I mean, yes.
Q Okay, all right. That's what I thought. So again, your CFPB --
A Oh wait, wait. Wait. I'll take another look at this. No. If you're referring to -- because Wells Fargo had failed to pay the promised $200,000 by 4/30/23 --
Q No, no. I'm referring to the first part of that sentence that says, "However, I changed and initialed the dates in Section 5 from September to October."
A Yes. That's correct. I'm sorry.
Q Okay. It was a mistake. You meant Section 8,

Paragraph 8.
A Yeah. I got it wrong. Yeah.
Q Okay. That's what I thought. All right. Well, so let's look again at Exhibit 22, Page 4 of 16 again, Exhibit 22, 4 of 16. Which dates did you initial and change from September to October in this paragraph?
A What section are we...
Q Paragraph 8, Mr. Morgan, of the settlement agreement, which is Exhibit 22.
A Yes. It would have been 8A. I crossed out September 5th and wrote in a date in October.
Q Okay. You said dates plural though in your CFBP complaint. What other?
A I think that's just another typo. I'm not the most adept keyboard operator.
Q Okay. That wasn't a representation or a statement in any respect that you changed the deadline for the payment in Paragraph 8B from September to October, is it?
A No. The payment -- the change in date was with the proposed foreclosure sale. They were late with the payment, so I felt that they should provide additional time.
Q All right. Let's take a look at Exhibit 5, which is Ms. Knight's affidavit once again. And then also if you could just hold your finger at Exhibit 14, which is -- it's one of the attachments. Exhibit 5, Paragraph 21. Exhibit

5, Paragraph 21. Are you with me?
A I'm with you.
Q Okay. Paragraph 21 on May 17th, 2023, "Mr. Radeker sent me an email with proposed revisions to the proposed settlement agreement. I had emailed them on April 24th, '23. True and correct copies of Mr. Radeker's email and attachment are attached as Exhibit A9."
All right. I'm going to represent that Exhibit A9 is actually Exhibit 14. So if you could turn to Exhibit 14 and look at Page 9 of 19. I’m sorry, Page 10 of 19 at the top. Exhibit 14, Page 10 of 19 at the top. Are you with me?
A Yeah.
Q All right. Paragraph 8B, Morgan Settlement Payment. Your attorney changed this to read "before the foreclosure sale". Is that correct?
A That's what it says.
Q Okay.
A I haven't seen this before.
Q You haven't seen it before. Okay. So the redline indicates that previously in Mr. Knight's original draft, there was a deadline, a date for a deadline. But your attorney changed it to remove a specific date or deadline. Is that correct?
A It appears to be so, yes.
Q Okay, all right. Let's take a look back to -- I'm

sorry, Exhibit 5 and Paragraph 21. Exhibit 5, Paragraph 21. Actually, Paragraph 22. I'm so sorry. Paragraph 22. Page 6 of 8 at top.

A Yes.

Q Okay. Paragraph 22 at the very bottom. This is Ms. Knight's affidavit again. "I accepted all of Mr. Radeker's revisions to the proposed settlement agreement except one. I did not accept the proposed changes to the timing of the short payoff which I left as September 4th, 2023 by 11:59 p.m. I sent my revisions to Mr. Radeker on May 24th, 2023. Mr. Radeker responded, 'Great, that's just fine.' True and correct copies of my transmittal email and attachment and Mr. Radeker's response are attached hereto as Exhibit A10."

And I will represent that Exhibit 15, if we can turn to it very quickly, is her Exhibit A10. Let's take a look at Exhibit 15. And let's look at the very first page which is actually 2 of 20 at the top. Are you with me?

A Yeah.

Q All right. Let's go down to the bottom where it's the email from Ms. Knight back to Mr. Radeker. And again, just as she testified in her affidavit, she said, "Drew, I accepted all of your changes except the payment date in Paragraph 8B. I changed it to September 4th, 2023." Ext cetera, et cetera. Is that correct?

A That's what it says.

Q And at the top of the page, Mr. Radeker responded back to Mr. Knight and said, "Great. Thanks. That's just fine." Is that correct?
A That's what it says, yeah.
Q Okay. And let's take a look at the -- back a few pages behind this. Up at the top, Page 11 of 20, Mr. Morgan. Page 11 of 20.
A Yeah.
Q Okay. And -- sorry. Indeed there in Paragraph 8B of the settlement agreement that she sent, it does have the September 4th, 2023 11:59 p.m. deadline. Is that correct?
A That's what it says, yes.
Q All right. So her testimony, to summarize I suppose, is that your attorney tried to eliminate a specific deadline for repayment. She refused that change and sent it back to him and he accepted. Do you have any reason to doubt her testimony?
A Well, the one thing I've noticed looking at all of these emails back and forth between them is I'm not copied on any of them. So I was completely unaware of all of this negotiation. The first time I saw anything was on April 24th when I met Drew Radeker at the Akin County Courthouse and he gave me the document. So I suspect that this -- this is the entire email exchange. But I have no idea. And I've never seen any of this until --

Q But you don't have any reason to doubt her testimony that I just characterized as what happened.
A I don't know who changed what, so I -- I would have to withhold judgement about that.
Q But you don't have any reason to -- reason to --
A Except I know this is not the agreement that I was prepared to sign.
Q Okay. What I have thought, Mr. Morgan, all along, and I don't know, is that you were aware that there was, as we just looked at, discussion between the two attorneys and --
A I was not.
Q You were not?
A I was not.
Q It's your testimony that the first time you ever saw a draft of this settlement agreement was when you met with Mr. Radeker on May 24th.
A Yes.
Q But he never emailed you a copy.
A NO.
Q Literally he handed you a copy on May 24th and that's the first --
A And sign this.
Q Okay. Let's look at Paragraph -- Exhibit 23. Exhibit 23. I'm sorry, are you with me, Mr. Morgan?
A Yes.

Q Okay. So this is a document that was filed -- if you look over on the second page, your attorney's electronic signature is on it. In the state court foreclosure action, Paragraph A, Defendant Morgan's counterclaims are dismissed with prejudice. B, Defendant Morgan consents that the entry of a deficiency, waive foreclosure judgment and withdraws his defenses to the same. Paragraph C, Plaintiff waives its right to have a personal money judgement, i.e. deficiency judgement against Defendant Morgan.

So I'm representing to you that this is a document that was filed in the state court. Did you not authorize this?

A I didn't -- I have never seen this, either.

Q Were you aware that Mr. -- that your attorney was going to agree to a filing in the state court action that would dismiss your counterclaims?

A No, I was not.

Q He never discussed that with you?

A He did not. And he never sent me a copy of this.

Q Okay. Let's go back to something that I think you said today. And if I remember correctly from my colleague Mr. Milam's excellent notes at the meeting of creditors, you made some reference to making an offer to pay Wells Fargo $100,000. Tell me about that.

A That's correct. During the time between the settlement and 2015 when the litigation commenced, I made repeated

efforts to get my mortgage modification. And I was shuffled around between different people. And I was repeatedly denied for various reasons. And nothing was consistent. One person would tell me one thing and a month later somebody would contradict them. So I stated recording all of those phone calls. And during that process initially, I proposed that I just start making my monthly payments modified by the settlement agreement. And they were rejected.

In another conversation with another Wells Fargo representative, I offered to pay $100,000 to get this thing resolved and get my mortgage modification. And that was also rejected.

Q Okay. Let me be a little more specific. I thought your testimony was that you had made an offer to Wells Fargo to pay $100,000 after the mediation --

A No.

Q -- in exchange for an extension of time.

A No, no.

Q There was nothing like that?

A Not from me, no. At least nothing I recall.

Q Let's go back to Paragraph 22. I'm sorry, Exhibit 22. Just a few more questions. Exhibit 22. It's Page 10 of 16 at the top, Mr. Morgan. Exhibit 22. Page 10 of 16 at the top.

A Okay, I'm here.
Q Are you with me?
A Yeah.
Q All right. Paragraph 24, Severability. "The provisions of this agreement are severable. If any portions of the provision or part of this agreement is held, determined, or adjudicated to be invalid, unenforceable, void for any reason whatsoever, each such portion, provision, or part shall be severed from the remaining portions, provisions, or parts of this agreement to not affect the validity or enforceability of any remaining portions, provisions, or parts."
Did you make a handwritten change to this paragraph as well?
A I don't think so. I don't think I've ever seen that. And I'm a little unclear what severability means.
Q I understand. It is a legal term. But your prior testimony was you mentioned three specific handwritten changes and you did say that you thought you made others, but you weren't sure. What I'm asking you is did you --
A I did make others.
Q I know. That's what I said. You said that --
A Not that I thought, I did.
Q Right. You said -- but you didn't describe any changes other than the three, correct?

A Yeah.
Q All right. What I'm asking you is one of -- is -- was one of the other changes that you made to Paragraph 24?
A Perhaps, but I can't recall.
Q Can't recall. So if you didn't make a change to Paragraph 24 -- well, never mind. That's a legal conclusion I suppose.
Mr. Morgan, you understand that even if the Court gives us stay relief right now, that it's going to take us some time to foreclose, correct? Isn't going to happen tomorrow.
A Yes, I understand.
Q Okay. Are you opposed to our request for relief from stay so that we can proceed with the foreclosure?
A Yes.
Q You are?
A I want to get a reverse mortgage and pay you off.
Q Okay.
MR. GLOVER: Your Honor, if I could have one second.
BY MR. GLOVER:
Q Mr. morgan, you do acknowledge and admit that you did receive a $200,000 payment from Wells Fargo, correct?
A I did, in June.
Q Okay. And that was a key provision of the settlement agreement. Is that correct?

A Yes.

MR. GLOVER: Your Honor, that's all I have at this time.

THE COURT: Any cross?

MR. PENN: Absolutely, Your Honor.

THE COURT: So how do you want to do this? Do we want to stay within the scope of the direct or do you want to just treat it as your direct?

MR. PENN: Your Honor, I believe it would be my preference to treat it as my direct, but I'll defer to the Court's preferences.

THE COURT: I'm suggesting that to save time.

MR. PENN: That's fine with me.

THE COURT: Okay. So he doesn't have to stay within the scope of your direct.

MR. PENN: Correct.

THE COURT: Okay.

MR. PENN: Thank you, Your Honor.

BY MR. PENN:

Q Mr. Morgan, why did you obtain a Pick-A-Payment loan from Wachovia?

A I bought my house in 1996. And I have refinanced it around 2001 for -- with another lender. And the payment was pretty stiff. And Wachovia was advertising the Pick-A-Payment loan product. And it would substantially reduce my

monthly payment. So I applied for the loan. I took no money out. It was only for the purposes of lowering my monthly payment. And then after the loan closed and Wells Fargo took over Wachovia that I realized that my monthly payment wasn't going to change, that I was still stuck with a high payment instead of the low payment that I had been promised.

Q How did you become involved in the Pick-A-Payment class action?

A I was solicited by Jeffrey Burns, a lawyer in California, who wrote me and asked me if I would be interested in joining the class.

Q And were you a member of the class at the time of the settlement order?

A Yes.

Q Did you receive the mortgage modification you believe you were promised in the settlement order?

A No.

Q what steps did you take to obtain that mortgage modification?

A I can't tell you how many times I applied, but I applied many times. Maybe not a hundred, but certainly at least 50. And I was shoved around different departments at Wells Fargo and given different reasons why they weren't making a loan. But the answer was always no.

Q Were there other class participants that were treated similarly in your understanding?
A Virtually every one of them.
Q Did you notify class counsel that you had been rejected?
A Yes.
Q What did the class members do?
A Well, two things happened. The first thing that happened was Jeffrey Burns filed a section -- a second class action lawsuit against Wells Fargo. And that was also settled. And the judge in that case found that Wells Fargo had violated the terms of the original settlement agreement. And Wells Fargo promised that they would give everybody their modification.
When that did not happen, I found out that individual class members were going to federal court to sue Wells Fargo and that Wells Fargo was settling with them. And so I looked for a lawyer to do that for me. And I hired Andrew Radeker. And he told me that I had a better case in state court because the individual who had closed the loan for Wells Fargo was not a licensed attorney in South Carolina, which was -- is required by state law. And he knew that because he had another client who had the same experience.
Q Do you recall the name of the person that closed the loan with you?

A John (indiscernible).
Q And when you were sued by Wells Fargo for foreclosure, was the changes to your mortgage or the -- did you bring counterclaims against Wells Fargo --
A Yes.
Q -- related to your class action claims?
A Yes. Yes. And I don't know the legal terms, but one was the fact that the Fed had closed the mortgage. The other was that there were no witnesses to the mortgage document. And there was one other that I can't recall. But yeah, there were claims that were valid because they were not precluded from being argued by the terms of the settlement.
Q And so how did you end up in an appeal with Wells Fargo in the state court litigation?
A The district court judge -- first he ruled in favor of my motions. Then a couple of days later he sent out an email saying that he had ruled against me. And then a few days after that, his clerk said that the order granting my motion had been signed in error. And so we appealed. And the South Carolina Court of Appeals reversed and remanded it back.
Q Do you happen to recall what counterclaims you had pending when you appealed?
A Well, it was the John (indiscernible) issue. And it's

unclean hands, is that a legal terminology for --
Q That is an affirmative defense, yes.
A Yes, unclean hands.
Q And briefly can you help us a little bit to understand the timeline? Do you remember when you were sued for foreclosure, what year that was?
A It must have been 2015. Because that's when the litigation started.
Q And do you remember what year the appeal was argued before the Court of Appeals?
A The -- 2022.
Q Okay.
A All right. Because we went to mediation in March of 2023. So I think that the reason we went to mediation was because the Court of Appeals had ruled in my favor.
Q And at the mediation -- so now we're getting to a year ago.
A Right.
Q In the mediation of 2023. And you don't dispute that what we're calling Debtor's Exhibit C and I believe what they call Wells Fargo's 22. Those are the same document. Is that correct?
A The mediated settlement agreement?
Q And I'm sorry, it is -- it's Wells Fargo's Exhibit 21.
MR. PENN: Your Honor, may I approach with the...

THE COURT: Mm-hmm.
BY MR. PENN:
A All right. No, that is an agreement I signed.
Q And so your understanding, your contemplation at the time of this agreement is embodied by the language in this document, is that correct?
A I'm sorry?
Q You don't dispute anything that you agreed to in this document.
A No, no. I signed this agreement.
Q And does this document -- if you look at Paragraph 4 to the document in the concluding sentence, does it contemplate that there could be disputes with a subsequently signed document? I'm sorry, Mr. Morgan. That would be the Debtor's Exhibit C.
A Okay. So I'm with you now.
Q Thank you. So I want to look at the last sentence of Paragraph 4.
A Yes.
Q And is it your understanding that if there was a dispute between this document and any subsequently signed document, that it would be the Court's determination?
A Yes.
Q And just looking real quickly into that document. This calls for you to receive $200,000 within 30 days of

execution; is that accurate?
A Yes.
Q Did you receive $200,000 from Wells Fargo within 30 days of the execution?
A I did not.
Q And at what point did you receive the $200,000 from Wells Fargo?
A Mid-June.
Q And how was that paid?
A They wired the money to Andrew Radeker's law firm and he then forwarded on some of the money to me.
Q So of the proceeds, is it accurate to state that you did not receive all of the proceeds?
A That's correct.
Q And of the remaining settlement proceeds or settlement funds that were delivered to you, do you still have any of those funds on hand?
A Yes.
Q And where are those funds now?
A They are in a bank account captioned debtor-in-possession.
Q How have the funds been used since you received them?
A To pay legal fees and other expenses in connection with this bankruptcy and some household expenses.
Q And is it fair to say that those expenses are related

to maintenance of the house?
A Yes.
Q What work have you done on maintenance of the house since you received the funds?
A A section of the brick wall around the yard fell down. I have to have that replaced. I had a toilet replaced in one of the bathrooms. I had some repairs to the swimming pool. I had a porch roof that had to be repaired. And there is ongoing work in -- the paddock fences were substantially replaced and I have ongoing repair work going on in the barn.
Q How have you determined what work needs to be accomplished with the limited funds that you have?
A Well, some things are obvious. You know, if a toilet doesn't work, you've got to fix it. Others is I had the house appraised over the summer. And one of the appraisers had a list of things that he thought should be attended to. So I have concentrated on those.
Q And was that list based upon increasing the value?
A Perhaps. But definitely getting it ready for a possible sale.
Q Have you met with anybody to discuss a possible sale?
A I have.
Q What do you believe a sale of 415 South Chesterfield would look like?

A It probably would sell for close to $3 million. The problem is that the market for big houses is very slow. So it would take a long time to sell. I mean, years if you look at any of the comparable sales. You know, you've got to find somebody who wants a big house and likes horses and who can afford to live in it. And that can be a small group of potential buyers.

Q Is it a small group of realtors that represent those potential buyers?

A Yes.

Q Do you believe that realtors or people selling real estate in the Akin marketplace are aware of your willingness to or interest in selling your property?

A A couple of them are because I have talked to them about the possibility of a sale.

Q Have you had any recent conversations about a sale?

A I have. Two brokers that I know quite well called me a week or two ago and said that they had a prospect and would I be interested in letting them show the house. So I said sure. So I packed the dogs up and left and they toured the house with the prospect. And he didn't feel that it was suitable. It turns out that by profession he is a building contractor and this house is in a historic district. And so, you know, he wanted to put in new windows and replace the clapboard siding with hardy plank and tear down the barn

and build a new barn. And the Akin Design Review Board would not agree to any of that work being done. And had I known that he was a contractor before he saw the house, I would have told the brokers that this was probably a wild goose chase.
Q What has caused you to focus in on a reverse mortgage solution? What has caused you to focus in on a reverse mortgage as a solution?
A Well, I'm old enough and it doesn't require any monthly payments. And there is enough equity in the house that it appears to be an easy loan to get. What I did not count on initially was the Wells Fargo litigation, the bankruptcy would be negative factors for any potential lender. And the fact that it's a big house in a small town that, you know, they have to look on a map to find before they do anything.
Q So in testimony today, is it fair to say we've talked about at least three reverse mortgage groups you've consulted with?
A Yes.
Q And could you just detail those for everybody?
A Well, the two that are active, Nationwide Equities is the one that's further along. You know, they have -- it appears that there is a three-step process for them to make an approval. The first step is they have an account representative. I don't know what his actual title is. But

he collects all of the data that they need in order to determine if they have an initial interest.

He then passes it along to a processor who does things like checks title and makes sure they have an updated appraisal and all of that stuff. And then it goes to an underwriter who reviews the file and then approves it.

So at Nationwide Equities, I am in the underwriting process, the last process. And what they have told me is that because the appraisal that I had done last summer are six months old, they want them updated. And that's really the last piece for them before they'll be prepared to make a commitment.

Long Bridge, the second company that I'm talking to, seems to be a little farther behind. I would say that they are in the processing category. They are looking at the data, but they have not yet underwritten the loan.

Q And have either Long Bridge or Nationwide Equities given you any indication as to the time necessary to complete the process?

A I think in Long Bridge's case I'm not sure. And in Nationwide's case I think that probably 30 days. Because it will take some time to get the appraisals done.

Q And to just explain to everybody here today, you suggested that you had a prior appraisal done last summer.

A Correct.

Q What was the result of that appraisal?
A Well, I had two done last summer. One valued the property at $2,994,000 and the other valued the property at $2,996,000.
Q And so in your understanding with those values, would there be sufficient funding from reverse mortgage to pay Wells Fargo $1.3 million?
A Yes.
Q Would there be sufficient funding to pay more than $1.3 million?
A I don't know. I've asked for $1.3 million. You know, from the lender's point of view, it's only a 41 percent loan-to-value ratio. So I don't know if they would go higher or not. I haven't had that conversation. I basically asked them for what I thought I needed.
Q And are you in recent and ongoing discussions with Nationwide Equities and Long Bridge?
A Yes.
Q And --
A Most recently yesterday.
Q And what did they tell you yesterday?
A Yesterday they told me that they were getting ready to order new appraisals. That's what Nationwide said. Long Bridge said that they were still working on the file. They had a few questions. You had written a letter explaining my

situation to Kerri Nagle, who was the broker I was working with. And so that letter seemed to answer a lot of their questions. So I forwarded that letter to them and I got an email response back saying thanks, this looks like it answers our questions.

And then both of them sent letters to me last night confirming their interest. Not a loan commitment, but a letter of intent I guess you could call it.

MR. PENN: Your Honor, I would like to approach the witness just to identify some documents.

THE COURT: You can approach.

BY MR. PENN:

Q Do you recognize this document?

A Yes.

Q Can you describe them for me?

A I'm sorry?

Q Can you describe them for me?

A Well, the first is a letter from Nationwide Equities which says that regarding Michael G. Morgan residing at 415 Chesterfield South in Aiken, South Carolina, he currently has an active application for a reverse mortgage. The current status of the application is in underwriting. Please advise if any further questions develop.

And then the Long Bridge document is pending loan modification and it's basically a form with a lot of boxes

to check off. And it's not very specific as to what's happening. But it does acknowledge that I've made application and they are working on my loan request.

MR. PENN: Your Honor, I would ask to have these -- let me pass them up. I would ask that be marked for identification as Debtor's F and Debtor's G.

CLERK: Nationwide (indiscernible).

THE COURT: They're just marked for identification. Wait until (indiscernible) have them or not.

(Debtor's Exhibits F and G marked for identification)

MR. PENN: Is there any objection to the admission (indiscernible).

THE COURT: Are you trying to admit them?

MR. PENN: I would move to have them entered into evidence, Your Honor.

THE COURT: Okay. Is there any objection?

MR. GLOVER: No, Your Honor. No objections.

THE COURT: Okay. They are admitted. F and G.

(Debtor's Exhibit F and G entered into evidence)

BY MR. PENN:

Q And to understand again, these are your basis for -- or evidence that you're moving towards a mortgage modification, is that accurate? And you believe that another 30 days

would be necessary for this to be --
A I think that that's an adequate amount of time, yes.
Q So I would like to ask you again a little more about Peggy Fitch. So I understand from your prior testimony that you gave Ms. Fitch a second mortgage on the house because of -- well, I will let you answer the question. Why did you give Dr. Fitch the second mortgage?
A Because she was throwing a fit about losing $250,000 in the Heritage Apartment deal. And we were a couple, and I offered that to her to just calm her down.
Q And you've seen today a copy of a judgement that was obtained. Do you believe that judgement is binding?
A No. That judgment is expired.
Q But the mortgage remains in place?
A Correct.
Q Why don't you think Ms. Fitch has pursued foreclosure of the mortgage?
A She -- well, for a couple of things. What prompted her to sue me was a year after we broke up, I married someone else. And she was upset about that. And so a couple of months later filed the lawsuit. And I have tried to resolve things with her, but unfortunately she is terminally ill. She has sold her medical practice and she is unwilling to have any kind of discussion with me.
So I have talked to her son and I've talked to her

lawyer. And they told me that she's taking her illness seriously and is really not having any contact with anybody. So, you know, if I work something out, it will be through her son.

Q Were you represented by counsel in your litigation with Ms. Fitch?

A No.

Q I want to dig briefly into Harbor Capital and your ability to fund the plan that we've proposed. Could you tell us in some level of detail how long Harbor Capital has been receiving future advances?

A Well, Harbor Capital was incorporated in Connecticut as a C-Corp in 1990. And its primary business was in doing affordable housing acquisition and rehabs. And those projects require a lot of money up front before the institutional investors step into their position at closing. So I had a number of individuals who would invest with me and they would be repaid at closing when the institutional investors contributed their money.

So, for example, the first deal that I did that Peggy Fitch was involved with was (indiscernible) Creek, which was a 504 garden apartment project in Roanoke, Virginia. And she put up I think $25,000 and got back $75,000 at the closing. And I had some other investors who were -- who had more money in the deal who obviously made more money at the

closing. And then I, Harbor Capital, was paid a big check from the proceeds of the loan closing as well.

So moving along, in late 2007 I went to contract on Heritage Apartments in Augusta, Georgia. And Peggy wanted to invest in that. And so without getting any of my other potential investors involved, it was just my money and her money that went into the deal.

But unfortunately that was also the year of the great recession. And the tax credit investor for that project was Morgan Stanely. And when the crisis, the financial crisis came, they backed out. The deal fell apart. And I lost my money and Peggy lost hers. She was very upset about that. She was my long-time girlfriend and I, you know, wanted to do something to, you know, resolve her concerns. So I gave her the second on my house.

Q And so understanding that that's how the mortgage came to be with Dr. Fitch, I want to focus in a little bit on the current status of Harbor Capital and the likelihood or your understanding of the likelihood that Harbor Capital will continue to receive future advances.

A Well, Harbor Capital I would say for the last 15 years or so has received money from my investor group with the idea that it would be repaid out of future deals. They would participate in future deals and reap a benefit. And so I would get regular wire transfers to Harbor Capital and

I would take some of that money for my own expenses, which was agreeable to my investor. And that has continued for many years.

Q And so is your contemplation in the plan a continuation of the program that's existed with your investors?

A Well, I've talked to one of them who has indicated a willingness to help me use the reverse mortgage for Wells Fargo and then he'll contribute some money to help me resolve Dr. Fitch's mortgage.

Q But is there an ability for you to fund the necessary cash into the plan outside of future investment or future advances into Harbor Capital?

A Well, I only have three sources of income. I have Social Security, I have a cottage that I rent, and I have my distributions from Harbor Capital.

Q And briefly can you describe for the Court your cottage rental program?

A There is a cottage on the property. And in the past I always just rented it to individuals. But for the last couple of years I rent it to two women in town who run it as an Airbnb. And I actually did not think it was going to be a successful business venture, but it's turned out to be extremely successful. So they pay me $800 a month and they take care of the cottage and they have tenants there all the time who pay the -- you know, a week of tenants is enough to

pay their monthly mortgage payment to me.
Q And opposing counsel and the Court have been very gracious with me in leading you a little bit, and perhaps that will continue.
Aside from Harbor Capital and the income generated from the rental of your guest house, the contents of the house have significant value, don't they?
A They do. I have a lot of antiques.
Q And in fact I think when we were working in the scheduling process perhaps you got a little frustrated with me when I made you give us some detail on those antiques, is that...
A It is. Because I had never thought about it. But you told me to look at a couple of websites, Chairish and 1stDibs, and so I did. And if I saw an item that looked like one of mine, that was the value I used for the schedule.
Q So the liquidation contemplated in your plan, is that a liquidation of non-exempt assets?
A I don't know what non-exempt assets are.
Q Thank you. Would that be your ability to sell antiques and collectibles to fund your plan payment?
A Yes.
Q And do you think that the sales of antiques and collectibles that you have would be sufficient to fund

$200,000 into the plan.
A Yes.
Q And again today it's your belief and understanding that with an additional 30 days you could close a reverse mortgage that would fund a $1.3 million payment to Wells Fargo?
A Yes.
Q And is that an accurate summary of what you have contemplated in your plan?
A It is. I mean, I would love to be able to pay Wells Fargo off. This litigation has been going on forever. And I would like to get on with my life.
Q If your meeting last week had resulted in an offer to purchase and sell, would you have modified your plan to call for a sale of the house?
A Yes.
Q Are there any other details you want to share with the Court or Wells Fargo this afternoon?
A Well, I only want to mention one thing about this civil litigation. You know, during discovery, Wells Fargo produced my loan application. And it turned out that it was forged. And so it grossly inflated my income and net worth. And so we hired a South Carolina handwriting expert named Mickey Dawson. And he opined that the document was a forgery, which explains I think why I may have had so much

trouble getting a modified mortgage. Because if somebody at Wells Fargo was looking at my current income and assets and comparing them to the forgery that was in their file, you know, they would conclude the my financial situation had deteriorated and therefore I didn't qualify for a modification when in fact my income and assets had remained the same. But nobody at Wells Fargo ever made that point to me. So until I saw the forged application, I had no idea.

Q Thank you, Mr. Morgan.

A Thanks.

MR. PENN: Your Honor, I don't believe I have any further questions at this time.

THE COURT: I'm going to ask a couple while he is still under oath if I can.

So in the mediated settlement agreement, Exhibit C. In Paragraph 1 where it says that you are to receive $200,000, what were you to receive $200,000 for? Why were you getting $200,000?

THE WITNESS: Well, 66 of it went to my lawyer.

THE COURT: No, but I mean why would they pay you -- in the course of this agreement, they gave you $200,000. What were you giving them in exchange?

THE WITNESS: I was dropping my lawsuit and we were arranging for time for me to get a new loan for a million-three to pay them off.

THE COURT: And then the second paragraph where it says, "Plaintiff will proceed with the foreclosure action uncontested by Defendant." What does that mean to you, uncontested by Defendant? What were you agreeing to do?

THE WITNESS: Where does it say that?

THE COURT: Paragraph 2, the first sentence.

THE WITNESS: Well, it meant that we had a pending counterclaim against them for unclean hands and the fact that a non-lawyer had closed the loan. So I was dropping that litigation and wasn't going to sue them again about it.

THE COURT: So you don't think the bankruptcy proceeding is contesting that in any way? That is uncontested by Defendant doesn't include not filing a bankruptcy petition to stop the foreclosure.

THE WITNESS: I never thought about that.

THE COURT: Okay. I am unclear on how you're planning on getting a mortgage -- a reverse mortgage when you have a second mortgage that is on the property. Does it not have any interest rate or anything? What would the balance of that be now?

MR. PENN: Your Honor --

THE COURT: There is a mortgage on the record, on the public record, right? I don't have it in my records, but that's what I understand.

MR. PENN: That is correct, Your Honor. It is

what I would describe as a friendly mortgage. It was a demand note.

THE COURT: It's still a cloud on the title. How is somebody going to loan money -- I wanted to ask him that question but I don't know if he knows the answer to that question.

THE WITNESS: I do.

THE COURT: So there's a mortgage on the property.

THE WITNESS: Right. It will be paid off at closing.

THE COURT: Does it have an interest rate? Do you have to pay interest on that mortgage?

THE WITNESS: I don't.

THE COURT: There's no note that says you pay any interest?

THE WITNESS: There's a note, but it's (indiscernible) and there are no scheduled payments.

THE COURT: Is there any interest rate?

THE WITNESS: And she's never made demand.

THE COURT: Do you have -- I mean, I don't have a copy of it. But it's a cloud on the title, right?

THE WITNESS: It is. But I thought it was included in the bankruptcy filing. You know?

MR. PENN: It is, Mr. Morgan.

THE WITNESS: Yeah.

THE COURT: Okay. I just wanted to -- direct before you go to cross. So go ahead.

MR. GLOVER: I'm sorry, Your Honor. Just a few follow-ups.

THE COURT: Yes, yes. And I do think at this point. You know, this is always confusing when you have competing motions and everything and you called the debtors as the witness. But I am considering you're on cross basically. Or do we care? Or do we deal with that when somebody objects?

MR. GLOVER: Right. I just have a few follow-up questions. Whatever it is.

THE COURT: Okay. You ask your questions and we'll deal with it when we get there.

MR. GLOVER: But I would like to -- let me ask my follow-up questions I guess.

CROSS-EXAMINATION OF MICHAEL MORGAN

BY MR. GLOVER:

Q Mr. Morgan, I think I understood what you said, but I'm not sure. Are you arguing that Wells Fargo should have paid you more than $200,000, so they should have paid you $200,000 plus whatever you had to pay your attorney?

A No. I never --

Q Okay.

A Sorry if I gave you that impression.

Q Okay. I mean, they paid you the correct amount of the money.
A That was the agreed-upon amount, yes.
Q Okay. If -- the two documents that you introduced as Exhibits -- I notice were not in your exhibit list and exhibit binder that were handed to us this morning, did you just give those to your attorney today?
A I emailed them to him last night.
Q Last night? Okay. If my math is correct, to get a $1.3 million loan at 41 percent of loan to value, you're going to need a $3.170 loan. You don't have an appraisal for $3.17, do you?
A No. I have an appraisal for $2,996,000.
Q That's not $3.17, correct?
A Right.
Q Okay. And this -- correct me if I'm wrong, this pending loan notification, is it dependent upon -- I'm not sure. Maximum claim. Whoever this -- Long Bridge is this lender.
A Yeah.
Q They're going to need an appraisal -- to fund you $1.3 million, they're going to need an appraisal of at least $3.17 million as well.
A Well, they may lend me less. And then I'll have to contribute cash to the closing.

Q Okay, fair enough.
A I don't know what the correct number is. I might be wrong about 41 percent.
Q Understood.
A But that's what I thought someone said to me.
Q Understood. You mentioned something about Nationwide is in the process of getting an appraisal. Have they asked -- did you give them a copy of your old appraisals?
A I have.
Q Well, what did they say about them?
A They said that they need one that's not six months old. So they needed this updated.
Q Okay. The -- you mentioned that recently you had some people out to the house to take a look at it.
A Yeah.
Q And those people were potential investors or actual purchaser?
A Purchasers.
Q Purchasers. I mean, what I don't get -- and this seems to be a repeat frame over the last six-and-a-half months -- is what are you going to do? Are you going to sell the property or are you going to get a reverse mortgage?
A I'm going to get a reverse mortgage.
Q Well, why are you taking the time to show people the property then?

A Well, because if somebody hits the number, you take it.
Q Yeah. You mentioned the fact that people have told you that this property, it just has to sit on the market for years of something like that.
A Yes.
Q Have you ever heard -- have you ever seen in any type of appraisal a -- you know, what is the term that they give it? I guess it's a marketing period or something like that where an appraiser uses a years'-long marketing period and gives an appraisal value?
A I haven't, no.
Q I haven't either. I don't think it exists.
I think that's it, Your Honor. I just have a few kind of closing comments, if you will. But I think those are the...
THE COURT: Let me see if Mr. Penn has any other questions.
MR. PENN: I'm sorry, Your Honor? Your Honor, I don't believe that's led to any redirect.
THE COURT: The only thing I want to know is looking at this new exhibit, Exhibit G, where did all this information on this piece of paper come from? There's a lot of information on here about -- for example, it says short to close of approximately $104,000, not factoring undisclosed second mortgage payoff. And then it goes on to

talk about what will have to be done with the second mortgage for this to even happen.

Who put all that information in this piece of paper? I'm not sure what I'm looking at.

THE WITNESS: I don't know what it is.

MR. PENN: Your Honor --

THE COURT: I mean, you can ask him questions if you want or I can just continue to ponder it.

REDIRECT EXAMINATION OF MICHAEL MORGAN

BY MR. PENN:

Q Mr. Morgan, could you detail for the Court regarding the Long Bridge application, who filled in the responses on this application?

A Someone at Long Bridge.

Q So you received this from Long Bridge Capital?

A Yes, last night.

Q Or Long Bridge Financial.

A Yes.

Q And then you provided it to me?

A Yes.

Q And so the responsive information in here is information that Long Bridge populated this document?

A Yes.

Q Based on their discussions and interviews with you?

A Yes.

MR. PENN: Your Honor, I don't believe I have any other questions on this.

MR. GLOVER: And I don't have any further questions for Mr. Morgan, Your Honor.

THE COURT: Okay. You can step down, sir.

THE WITNESS: Thank you.

THE COURT: Do you have any other witnesses?

MR. GLOVER: Your Honor, I do not.

THE COURT: Mr. Penn, any other witnesses?

MR. PENN: Nothing further from the Debtor, Your Honor.

THE COURT: Okay. We admitted all the exhibits except Exhibit 25. And Exhibit 25 appears to be 181 pages of a deposition. Is this something that I need to --

MR. GLOVER: Your Honor, I think I can take care of that very quickly.

THE COURT: Okay.

MR. GLOVER: That was in there only for a piece of information that Mr. Morgan I think has volunteered. I am willing to withdraw that exhibit from the record.

THE COURT: Okay. So it is not offered for admission unless you want to offer it for admission yourself, Mr. Penn.

MR. PENN: No thank you, Your Honor.

THE COURT: Okay. 25 is not admitted. Do you

want me to check exhibits with you since we swapped out?

CLERK: Yes, ma'am.

THE COURT: One through 30 for the Movant, minus Number 25.

(Movant Exhibits 1 through 24 and 26 through 30 entered into evidence)

CLERK: Okay.

THE COURT: And then A through G admitted for the Debtor. Okay?

(Debtor's Exhibits A, B, C, D and E entered into evidence)

THE COURT: Okay. Proceed with your arguments whenever you're ready. Do you need a break before that?

MR. GLOVER: I'm fine, Your Honor, if you are.

THE COURT: Okay. Go ahead.

MR. GLOVER: Your Honor, I would like to pick up on something that the Court noted. I mean, there are many, many things about the proposed refinancing that just don't make any sense. But one of them of course is something that Your Honor alluded to. There is clearly -- and I don't know the South Carolina law on this, frankly. But there is almost certainly a statute to propose, if you will, pursuant to which a judgment lien or a recorded judgement which affects a lien is no longer valid. Ten years maybe, something like that.

There's also a statute of limitations during which you can sue on a debt whether it's a judgement or not. But to my knowledge of basic creditor rights law is that when that lien is satisfied, that second mortgage lien, unless it's limited, and I don't know, to $250,000, that there's nothing that would prevent the owner of that lien from demanding the full indebtedness that's due and owing thereunder. She is not in any way violating a statute of limitations by moving affirmatively to recover the amount, and she's not really relying on the judgment lien. Because as they have said, there is a mortgage. So that seems to be a major, major issue.

And I know that the flippant answer was, well, but we're going to pay her off at closing. Well, with what? What gives them a right without a confirmed plan to pay out $180,000? The answer is nothing. They would have to pay at least 250. And if that mortgage is not limited, they'll have to pay the full amount that's owed thereunder.

So I think it's an excellent point. Again, it's one of many, many points where a lot of these plans -- again, no disrespect to Mr. Morgan, but are truly pie in the sky as we sit here and all of the Chapter 11 plans that we've all looked at in our lives.

I think there are several ways the Court could go. And I understand that. The Court made mention of -- pointed

to the mediated settlement agreement. And I think Your Honor made mention of this at the very beginning of the hearing. And that is, you know, well, is there some type of exclusive retaining jurisdiction clause in any of these agreements. I don't really read that -- we looked at it a second ago, Your Honor. I don't really read that to be an exclusive jurisdiction. But regardless what I think this Court can do is because he has put this issue of the $1.3 million payoff right in his plan -- and there's no doubt about that. It is front and center. I think the Court can absolutely apply South Carolina law that a client is bound by the actions of its attorney. And it's in our brief. We didn't -- we cited a couple of cases. It's pretty much blackletter law. The evidence is clear, crystal clear, that his attorney sent that executed settlement agreement back to Wells Fargo and represented that that was the document that he signed.

Maybe Mr. Morgan does have malpractice claims against Mr. Radeker. I don't know. And we cited a case that says -- that basically says that, that, well, you're bound. Maybe you have some claims against your attorney, but you are still bound to this settlement agreement. And I think the Court absolutely has jurisdiction, authority, whatever you want to call it, to reach that conclusion.

And as I said at the beginning, you know, what we

are seeking here is -- the specific relief we are seeking is a dismissal and stay relief, right? Those are our two motions. But what we are also seeking is a ruling from this Court that Mr. Morgan is bound by that settlement agreement. And more specifically, he is bound by that clause that had a termination date, an expiration date and that payoff option at $1.3 million.

Again, it's not, you know, because the property value, it's not a million-dollar swing. We're talking about for all practical purposes approximately a $200,000 swing. But look what Wells Fargo has had to do to get him to do anything in this case. We've had to spend all this time, all of this money. And in addition, we paid I believe about $18,000 in post-petition insurance and taxes. That's more money that's out of Wells Fargo's pocket.

And I just don't -- I think the Court has the jurisdiction to do that, and I think the uncontroverted evidence and the uncontested black letter law in South Carolina about a client being bound by his attorney, I think you can easily reach that decision today here, Your Honor.

But I think at a minimum, at a very, very minimum, our motions, both of which travel on the inability to confirm a plan, now that we have its cause, it's clear, I don't need to go through that law with you, Your Honor, I know.

But if that plan is not confirmable -- and it's not, it's simply not -- then we are due stay relief and we are due for this case to be dismissed as well. Thank you, Your Honor.

THE COURT: Okay. From the Debtor?

MR. PENN: Thank you, Your Honor. Harrison Penn on behalf of the Debtor. If it pleases the Court.

Settlement agreements seem to be binding on everybody except Wells Fargo. At the start of this case in 2011, we entered into a settlement agreement with Wells Fargo where we were promised a mortgage modification, or at least a real opportunity at a mortgage modification, and that was never provided. That litigation then proceeded into state court. And at that point Mr. Morgan filed his first set of counterclaims and defenses against Wells Fargo's allegations. And Wells Fargo's position, as evidenced in the court of appeals order, was that he had waived all those claims as a result of his settlement in the class action, which again, Mr. Morgan's position is that was never honored by Wells Fargo.

Your Honor, that ultimately was appealed and it was decided in favor of Mr. Morgan. But at that time when it was decided in favor of Mr. Morgan, his prior counsel had withdrawn the initial counterclaims and defenses and proceeded with one counterclaim for breach of the attorney

choice -- breach of the attorney choice statute paired with unconscionability. That is the counterclaim that was dismissed with prejudice or purportedly dismissed with prejudice last summer after the mediation settlement agreement and what I would describe as the contested settlement agreement.

Your Honor, again, looking at when we were at the point of just the mediation settlement agreement, it called for payment of $200,000 to Mr. Morgan within 30 days. And that payment was never made.

So we now look at the contested settlement agreement. And, Your Honor, on the very face of that document I have many concerns. But one of which is it created a scenario where Mr. Morgan would have never been able to perform because performance was due on Labor Day, September the 4th, which is a day that the bank was closed.

THE COURT: Before Labor Day. It was due before that time, right?

MR. PENN: Your Honor, I believe the language would say that he had up until that time to pay. And so I would suggest that at that point in time, at 9:00 in the morning on September the 4th, it was not possible for him to pay.

THE COURT: But he had the day before, the day before, and the day before.

MR. PENN: Certainly, Your Honor. And that did not happen, I agree. But it's the Debtor's position that in contract interpretation when a deadline falls on a weekend or a holiday, that that deadline is moved to the next business day.

THE COURT: But it didn't happen on that day, either.

MR. PENN: Correct, Your Honor. On September the 5th before noon the Debtor filed for relief in Chapter 11.

THE COURT: But how does that extend the date in the agreement? I mean, if you assume that agreement is binding, how does filing bankruptcy extend the date to pay the money?

MR. PENN: Your Honor, I believe that that would be an extension under Section 108 of the Bankruptcy Code. I believe that the time would have been extended on -- by virtue of his filing the petition. But even then --

THE COURT: Elaborate on that. I don't know what you're talking about. So tell me about it.

MR. PENN: Okay. Thank you, Your Honor.

THE COURT: I mean, I know a lot of the Bankruptcy Code, but I don't remember every part at every second.

MR. PENN: Certainly, Your Honor. I believe that when Mr. Morgan filed the bankruptcy, that his rights and capabilities went into that bankruptcy with him. And that

included his right to be able to pay $1.3 million to satisfy this mortgage. I believe that that right continues up until such time as he is no longer in a bankruptcy proceeding or there's a confirmed plan or an order that says otherwise.

THE COURT: So every debtor that comes into bankruptcy brings with him the right -- I mean, lots of debtors owe money for various reasons that are due on various dates. But when they file bankruptcy, they get an automatic extension?

MR. PENN: Your Honor, I believe that's the case. I believe that if you look at any debtor that has filed before a foreclosure sale, they would have the opportunity to assume and cure those obligations.

THE COURT: Because the foreclosure is stayed.

MR. PENN: Correct, Your Honor.

THE COURT: You still have your state court rights because the hammer hasn't fallen yet.

MR. PENN: That's correct, Your Honor.

THE COURT: But what those rights are is a different question. So anyway, where is the lawyer that can come in here and corroborate his story or some piece of paper or something that says that this agreement is not binding? Something. I mean, how are you going to get around the fact that this is his lawyer who transmitted this agreement, took all the actions that are in the agreement.

He was representing him. It's a statement -- it's a party admission, or I forget which one it is. But you hire somebody. If you hired the wrong person, that's not on Wells Fargo, that's between you and that person. So his lawyer is acting on his behalf even if he didn't know about it. Why do I go behind that agreement?

MR. PENN: Your Honor, I believe that this is a Court that's sitting in equity. And a Court --

THE COURT: When people say that when they don't have anything else to say. I'm looking for a legal argument, a legal argument of why it's not an enforceable agreement.

MR. PENN: Your Honor --

THE COURT: If you don't have one, then you just say it.

MR. PENN: Well, argument why it's not an enforceable agreement is, Your Honor, the Debtor's testimony today that that's not the agreement he signed, that there was never a meeting of the minds as to the terms of that agreement.

THE COURT: Well, let's say that I don't believe him. So where is the corroborating evidence that -- I mean, I've got a lawyer -- an affidavit admitted into evidence that says that this was the agreement.

MR. PENN: Your Honor, Mr. Morgan has reminded me

to point the Court towards Debtor's Exhibits D and E, which were when that second settlement agreement or the contested settlement agreement was transmitted to Mr. Morgan, he immediately emailed Mr. Radeker and said this is not the agreement I signed. And I understand the Court's position, Your Honor --

THE COURT: That's not my point.

MR. PENN: -- that you want Mr. Morgan to give you a clear legal argument outside of the equities of the case that he has an ability to continue and pursue the settlement agreement. And, Your Honor, my first position is I don't believe the second agreement was binding. And my second position is, Your Honor, I think that the terms of the agreement that everybody agrees they've signed would suggest that it continues to be binding, that his ability to pay $1.3 lasts up until the time of foreclosure. And I don't think they have reached that time, Your Honor. And frankly --

THE COURT: So why -- let's say that it's still there. So why do you need the bankruptcy case? Just pay the $1.3, get the reverse mortgage. Why a bankruptcy case? Why do you need to do that through a plan?

MR. PENN: Because, Your Honor, we are here to ask the Court to (indiscernible) to encourage Wells Fargo to accept the resolution.

THE COURT: So I have no idea what -- how any money other than the cottage rental and the Social Security come into this case. I have no idea what Harbor Capital does, who these people are, how the money comes in, when it comes in, how regularly. Nothing to give me any comfort level of there being money to fund anything that has anything to do with Harbor Capital or any investor, any outside investor. It's just a bunch of I think this, or I can't quantify it.

I mean, you know what those kind of documents look like. You know, you make a budget. You say what you've got in the past to support what you're going to get in the future, what your prospects are. It was just all very squishy. So I am very skeptical about that. If you have anything in the testimony you heard that gives me some comfort that there's some month through that entity and what the heck it does. I mean, at the moment what it does, not some -- in 1990 or whenever. What does this company do now that is going to produce any kind of profit other than get money from people and give it to the Debtor. That's what I got from it.

MR. PENN: And, Your Honor, the future advances that would come into Harbor Capital are to continue the work that Harbor Capital --

THE COURT: But what is that even? What is a

future advance? What does that mean?

MR. PENN: Your Honor, there are parties that are paying Harbor Capital to identify deals for Harbor Capital and analyze deals for Harbor Capital and others to participate in. And --

THE COURT: So normally there would be some kind of document trail. I give money under these conditions, you can use some of the money -- something to -- I mean, this is a business court. You know? Something to show that there is a business there.

MR. PENN: And, Your Honor, I don't want the Court to think that Harbor Capital is the only solution for funding the payments necessary under the plan. This is a 10,000-square-foot house. And even from the pictures that you can see attached to the appraisal, there are significant antiques and collectibles that have value in excess of $200,000 that could be liquidated and used to fund this plan of reorganization.

THE COURT: And they've been sitting there for six months, as has the house. And no action to sell, nothing so far. No action. Not one step forward until you're pushed by the creditor. I mean, there's just been nothing so far to move in the right direction.

I have no idea how we're getting past that second mortgage. I don't know how much it is. I mean, you can say

250, but I don't have a comfort level that there's not some kind of interest rate in that mortgage or attorney fee provisions or something else. I mean, how did it get to four-hundred-and-something thousand in a judgement? You know? I don't know that the explanation is -- do I have the judgement in...

MR. GLOVER: It's not in the record, Your Honor.

THE COURT: If I do, I might have a clue. But -- no, if I don't have it in evidence, I don't want it. I'm just saying I might have a clue in here somewhere when I go back and look. But even if $250,000, in the Exhibit C I think it was -- or F or G -- there's still question, question, question about what are we doing about that mortgage. Don't even know what it is. Don't know what to do with it. There's no plan for that. It might be in the plan, but you're talking about closing the reverse mortgage before the plan is confirmed. So you have to clear that I assume to get -- either subordinate it or get some kind of release of it. And I heard that that's not a thing. We don't have a release, you don't have a subordination. Just that I know this person and maybe we can work something out. That's all I got. That's just not a business plan, you know?

Okay, go ahead. I just have a lot of questions and I was wondering if you saw something I didn't.

MR. PENN: Thank you, Your Honor. Your Honor, certainly we are here in a business case or in Chapter 11, but Your Honor, Mr. Morgan is here as an individual. He is here to support the plan that he's filed. He believes it's feasible. I understand the Court's concerns with the Fitch mortgage. The Fitch mortgage does exist. It was not created as -- as detailed today, it wasn't created as a regular business transaction. And we are continuing to work with Dr. Fitch and her attorneys and family. She is aware of this case. She has notice of this case. And they have not appeared today.

In terms of Mr. Morgan's history with Mr. Radeker, Mr. Radeker has been unresponsive to the Debtor at this point.

THE COURT: There are discovery rules. I mean, you can ask for -- you know...

Okay. So under the testimony, what do you think the property is worth from the -- what does the testimony tell me I should find the property as worth?

MR. PENN: I believe that the property is worth at a minimum the $1.48. And I believe that it's up to $3 million.

THE COURT: That wasn't what I asked. I said what do you think -- I mean, you're going to pick the low number when it's to your advantage and the high number when it's to

your advantage. And that's not what the Court's going to do. I'm going to pick what I think the value of the property is likely. I mean, you can't put one value in your plan and cut somebody's value down and then on the other hand put a different value on a loan application. I mean, we're talking about good faith. So what is the value of the property?

MR. PENN: Your Honor, it's not the Debtor's value that's on the loan application and it's not the Debtor's appraisal. And so I am not here today to present the $3 million appraisal as an appraisal that the Debtor has obtained. But it is the Debtor's -- it does lead to the Debtor's understanding of the value of this property. The Debtor has been very actively engaged in the Akin marketplace for this type of house.

THE COURT: It didn't sound like it to me. It sounded like there was some dabbling. I mean, how hard is it to list a piece of property? You enter into a listing agreement. If nobody bites, nobody bites.

MR. PENN: Thank you, Your Honor.

THE COURT: I mean, I don't -- I don't get that from the testimony. Maybe I missed something. So I'm trying to see what I missed.

So I thought part of your argument or a little bit of it was that they are adequately protected, that the $1.3

million if that's what it is, is adequately protected by equity.

MR. PENN: It is.

THE COURT: So what is that equity? You're saying at least $1.48. Well, you can eat that up pretty quickly. There's not -- that's not a huge cushion. It's not insignificant, but it's not huge, $1.3 to $1.8. I mean, to $1.48. So are we talking about equity up to $3 million? You know? I mean, I didn't ask him the question I usually ask people; what would you sell it for? But I left that one alone. I'm assuming it's not $1.48 though from the testimony that I did hear that we're holding out for something a lot higher through the loan application process and everything else.

MR. PENN: That is correct, Your Honor. And I do believe it would be less than $3 million if he were to sell.

THE COURT: You know, another thing I don't know anything about -- and maybe it's in the disclosure statement or something -- does Harbor Capital owe money? I mean, is it even a company that can continue to make any kind of contribution and does it have any assets? Is that -- I was looking at the schedules quickly and --

MR. PENN: I believe it has a $5,000 value in the schedules based on the amount of money that was in its bank account at the time of the petition.

THE COURT: I mean, certainly it has to owe somebody money if it's taken in all these investments, or at least have investors that are expecting a return. I mean, there's no tax return for it or anything like that that would help me understand the nature of that business.

Okay. Anything else you want to add?

MR. PENN: No thank you, Your Honor.

THE COURT: Okay. So I'm going to ask you a question. In your brief, there's repeatedly these extra exclamation points. Does that have any significance to you?

MR. GLOVER: No, it doesn't. And I noticed that. And I have no idea how it got there.

THE COURT: I didn't know if it was come kind of cite-checking program that was putting something there --

MR. GLOVER: No.

THE COURT: -- that I should be worried about. Because there were a bunch of exclamation points throughout it.

MR. GLOVER: No. And I apologize, Your Honor. I noticed that as well.

THE COURT: Okay. Go ahead.

MR. GLOVER: No, there was just -- I don't have anything else other than just to point out that we discussed 108 -- it's 108(b)(2) in our reply, Docket 36. On Page 13 we dropped a footnote about it as well.

So my understanding is 108(b)(2) could potentially, assuming that the payoff extermination date had not run on September the 4th, I, like the Court, do not understand the significance of Labor Day. At any rate, I don't think it can be extended under 9006. I don't know of any colorable argument there.

But let's just assume that it had not run and then for some crazy reason it ran on the 5th. But 108(b)(2) would extend it -- not a statute of limitations, that's int eh statute as well. But it would extend that time into the latter of the natural expiration or 60 days is what that 108(b)(2) says.

THE COURT: Right.

MR. GLOVER: Yeah.

THE COURT: And I was trying to apply that to this situation is what I was having trouble with.

MR. GLOVER: Well, and so that 60 days has long run even if, again, how we would get to a point where a September 4th expiration date had not expired on September the 5th, I'm not sure. But if we got there, that -- it seems to me that that would decide the matter.

And I dropped a footnote. I'm not even sure if they could take advantage of 108(b)(2) because it relates to curing or -- oh, it relates to curing. And I'm not sure paying a $1.3 million short payoff option is a cure, really.

So at any rate, I just wanted to point the Court out that we (indiscernible).

THE COURT: Okay. Do you have anything else you wanted to say, Mr. Penn?

MR. PENN: No thank you, Your Honor.

THE COURT: Okay. I've got an annoyingly busy schedule coming up. So I'm not going to be able to give you an opinion right away. It's going to be a little bit before I can get to it. My little bit though is usually about two weeks. It's not like forever. It's not -- I shouldn't say this, not like state court timing or anything. I mean, it's slow for bankruptcy, but I'm not sure that I'll be able to work through it. Because I want to be fair with it. I'm going to have an impression. I probably gave you some indication of my impression from my questions. But you never know. Because when you go back and look through the things, sometimes you see something that you didn't expect to see. And this is a lot of information, so I want to make sure I look through it again.

(Whereupon these proceedings were concluded at 3:55 PM)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: October 15, 2024